

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-06-249-CV

PLAYOFF CORPORATION, DONRUSS                    APPELLANTS AND
PLAYOFF, L.P., DONRUSS LLC, AND                          APPELLEES
ANN (BLAKE) POWELL

V.

LAWRENCE BLACKWELL                              APPELLEE AND
                                                         APPELLANT

------------

FROM THE 141ST DISTRICT COURT OF TARRANT COUNTY

------------

## OPINION ON REHEARING

------------

After reviewing appellee/cross appellant, Lawrence Blackwell's motion for rehearing and/or motion for en banc reconsideration, we deny the motions. We withdraw our December 11, 2008 opinion and judgment and substitute the following.

This is a breach of employment-contract case. The key issue is whether the oral employment contract in question is unenforceably indefinite as a matter of law. We hold that it is, and we affirm the trial court's take-nothing judgment notwithstanding the verdict on Lawrence Blackwell's breach of contract claim against Playoff Corp., Donruss Playoff, L.P., Donruss LLC, and Ann Powell (collectively, "the defendants"). We also affirm the trial court's denial of the defendants' motion for attorney's fees under the Texas Commission on Human Rights Act.

**Background**

The jury heard six days of testimony from fourteen witnesses, and the trial court admitted approximately 1,200 pages of exhibits into evidence. The following summary reflects only the evidence essential to our resolution of this appeal.

Powell founded Playoff Corp., a sports trading-card company, in 1992. In 1997, Playoff hired Blackwell as a consultant for $1,500 per day. A few months later, Powell and Blackwell began a romantic relationship, which continued until February 2002.

In December 1999, Playoff hired Blackwell as an employee, and Powell appointed him to serve as Playoff's president. The terms of Blackwell's

2

employment agreement are the crux of this case. According to Blackwell, he and Powell orally agreed to the following eight terms:

1.   Playoff would employ Blackwell;

2.   Playoff would not pay Blackwell $600,000 in consulting fees that it allegedly owed to him;

3.   Playoff would pay Blackwell a lower salary than he would have earned as a consultant;

4.   Blackwell would not engage in business opportunities with other companies or organizations in which he, in reasonable probability, would otherwise have had an opportunity to engage;

5.   Blackwell would loan money to Playoff and entities contemplated to be formed by the parties;[1]

6.   Blackwell would sign personal guaranties for loans made to Playoff and entities contemplated to be formed by the parties;

7.   Playoff and Powell would pay Blackwell 25% of the proceeds from the sale of Playoff or entities contemplated to be formed by the parties, if any, after reducing the proceeds from the sale by $5,000,000.00 (Playoff's agreed fair market value at the time of the alleged employment agreement); or 25% of the fair market value of Playoff or entities contemplated to be formed by the parties, if any, after reducing the fair market value by $5,000,000.00, on the last day of his employment if Playoff or any entity contemplated to be formed by the parties terminated Blackwell's employment; and

---

[1] The "entities contemplated to be formed" are, according to Blackwell, Donruss Playoff, L.P. and Donruss LLC (collectively, "Donruss").

3

8. Playoff and Powell would pay Blackwell 25% of any distributions made by Playoff or any entity contemplated to be formed by the parties after payment of taxes owed by Powell arising from the operation of Playoff or any entity contemplated to be formed by the parties, if any.

Blackwell testified that he and Powell shook hands over the deal but did not memorialize the agreement in writing. Powell denied the existence of any agreement whatsoever, calling Blackwell's testimony regarding the handshake deal "a complete lie."

Blackwell continued to work for Playoff and related entities until November 2002, during which time the Playoff entities greatly increased in value. The parties hotly contested whether Blackwell resigned or Powell terminated his employment.

Blackwell sued the defendants for sexual harassment under the Texas Commission on Human Rights Act (TCHRA), alleging that Powell terminated him when he refused to rekindle their romantic relationship. He later added claims for breach of contract, fraud, and breach of fiduciary duty and nonsuited his TCHRA claims. The defendants filed a motion for attorney's fees and costs under TCHRA. The parties tried Blackwell's claims to a jury and submitted the issue of TCHRA attorney's fees to the court.

The trial court granted a directed verdict in favor of Donruss on Blackwell's breach of contract claim and in favor of all the defendants on his

4

fraud claim. The jury found that Blackwell and Powell agreed to the eight terms set forth above and that Playoff and Powell failed to comply with the agreement. It also found that Blackwell did not resign and did not engage in any misconduct that justified his termination. With regard to breach of contract damages, the trial court instructed the jury to consider only the following element:

> Twenty-five (25%) of the fair market value of Playoff Corporation, Donruss Playoff, LP and Donruss LLC (after reducing the fair market value by $5,000,000.00) on the last day of Lawrence Blackwell's employment, if any, with Donruss, LLC, Donruss Playoff, LP, or Playoff Corporation.

The jury returned a verdict on breach of contract damages of $6,100,000.

The trial court first rendered judgment for Blackwell for $6,100,000, but then granted Powell and Playoff's motion for judgment notwithstanding the verdict and rendered a take-nothing judgment. In the order granting Powell and Playoff's motion for judgment notwithstanding the verdict, the trial court stated,

> [T]he court is of the opinion that Plaintiff Blackwell should take nothing by way of his claims against any Defendant. The alleged oral agreement found by the jury in Question 1 is legally unenforceable. In particular, but not by way of limitation, the Court finds that the alleged oral agreement found by the jury in Question 1 is insufficiently definite as a matter of law. The jury's finding in Question 1 cannot support a recovery in favor of Plaintiff Blackwell against any Defendant.

5

The trial court also denied the defendants' motion for attorney's fees under TCHRA. Blackwell appeals from the judgment not withstanding the verdict, and the defendants appeal from the trial court's denial of their motion for TCHRA attorney's fees.

**Blackwell's Appeal**

**1.    Standard of review.**

A trial court may disregard a jury verdict and render judgment notwithstanding the verdict ("JNOV") if no evidence supports the jury findings on issue necessary to liability or if a directed verdict would have been proper. *See* Tex. R. Civ. P. 301*; Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003); *Fort Bend County Drainage Dist. v. Sbrusch,* 818 S.W.2d 392, 394 (Tex. 1991). A directed verdict is proper only under limited circumstances: (1) when the evidence conclusively establishes the right of the movant to judgment or negates the right of the opponent; or (2) when the evidence is insufficient to raise a material fact issue. *Prudential Ins. Co. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *Ray v. McFarland,* 97 S.W.3d 728, 730 (Tex. App.—Fort Worth 2003, no pet.).

To determine whether the trial court erred by rendering a JNOV, we view the evidence in the light most favorable to the verdict under the well-settled standards that govern legal sufficiency review. *See Wal-Mart Stores, Inc. v.*

6

*Miller*, 102 S.W.3d 706, 709 (Tex. 2003). The standard for reviewing a judgment notwithstanding the verdict, like all other motions rendering judgment as a matter of law, requires a reviewing court to credit evidence favoring the jury verdict if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007).

## 2. Is the alleged employment contract unenforceably indefinite?

In his fourth issue, Blackwell argues that the trial court erred by granting judgment notwithstanding the verdict because—contrary to the trial court's statement in the order granting Powell's motion for JNOV—the alleged employment contract is not too indefinite to enforce. The defendants argue that eight indefinite terms in the agreement, including "fair market value," render the whole unenforceably vague.

A contract is legally binding only if its terms are sufficiently definite to enable a court to understand the parties' obligations. *Fort Worth ISD v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000). "The rules regarding indefiniteness of material terms of a contract are based on the concept that a party cannot accept an offer so as to form a contract unless the terms of that contract are reasonably certain." *Id*.

A contract is sufficiently definite if a court is able to determine the respective legal obligations of the parties. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992). Contract terms are reasonably certain "if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." Restatement (Second) of Contracts § 33(2) (1981). If an alleged agreement is so indefinite as to make it impossible for a court to fix the legal obligations and liabilities of the parties, it cannot constitute an enforceable contract. *See id*.

An agreement to make a future contract is enforceable only if it is "specific as to all essential terms, and no terms of the proposed agreement may be left to future negotiations." *Fort Worth ISD*, 22 S.W.3d at 846 (quoting *Foster v. Wagner*, 343 S.W.2d 914, 920–21 (Tex. Civ. App.—El Paso 1961, writ ref'd n.r.e.)). "It is well settled law that when an agreement leaves material matters open for future adjustment and agreement that never occur, it is not binding upon the parties and merely constitutes an agreement to agree." *Id*.

Whether an agreement fails for indefiniteness is a question of law to be determined by the court. *COC Servs., Ltd. v. CompUSA, Inc.*, 150 S.W.3d 654, 664 (Tex. App.—Dallas 2004, pet. denied); *see also T.O. Stanley Boot Co.*, 847 S.W.2d at 222.

The question here is whether the term "fair market value" as used in the alleged agreement is unenforceably indefinite; that is, whether "the fair market value of Playoff Corporation or entities contemplated to be formed by the parties, if any . . . on the last day of [Blackwell's] employment" is reasonably certain and provides a basis for giving an appropriate remedy.[2] *See* Restatement (Second) of Contracts § 33(2)*.* Several Texas courts have held that the fair market value of a company is a measure of damages to be resolved by the fact finder. *See Willis v. Donnelly*, 199 S.W.3d 262, 275 n.24 (Tex. 2006) (holding fair market value of stock shares is the appropriate measure of damages when employer breaches agreement to compensate employee with stock); *Miga v. Jensen*, 96 S.W.3d 207, 215 (Tex. 2002) (same); *Bowers Steel, Inc. v. De Brooke*, 557 S.W.2d 369, 371 (Tex. Civ. App.—San Antonio 1977, no writ) (same). The pattern jury charge also uses the term "value" in an instruction on benefit-of-the bargain contract damages. *See* Comm. on Pattern Jury Charges, State Bar of Texas, *Texas Pattern Jury Charges: Business, Consumer, Insurance, Employment* PJC 110.3 (2006). Courts in some other jurisdictions have held that "fair market value" is sufficiently definite

---

[2] Blackwell suggests that the meaning of fair market value and the method of calculating same are merely ancillary aspects of the alleged agreement. We disagree because the 25% of the companies' fair market value dwarfs the other consideration due under the alleged agreement.

9

as a price term in an option contract to support an action for specific performance. *See, e.g.*, *Coodwest Rubber Corp. v. Munoz*, 216 Cal. Rptr. 604, 604–05 (Cal. Ct. App. 1985) (collecting cases from several states).

But just because "fair market value" is an appropriate measure of damages to be determined by the jury in some cases and sufficiently definite as a contract term in some contexts does not mean that every contract containing the phrase is sufficiently definite to be enforced. In the context of this case, the only evidence of an alleged agreement containing the phrase "fair market value" came from Blackwell's testimony.

Blackwell acknowledged that they did not have an understanding as to how market value was to be determined in 1999. And the evidence shows that even Blackwell realized the parties needed to agree on a valuation method during later negotiations. In a document dated March 27, 2002, and titled "Proposals for a Working Arrangement for Larry Blackwell and Ann Blake*,"* Blackwell wrote,

> If company is sold or I am no longer with the company for any reason: Receive 25% of sale amount or value as determined by formula (*formula or methodology still needs to be determined*) on an after-tax basis, less the amount of $1,250,000.00 (which equals 25% of the $5 million threshold).

[Emphasis added.] Likewise, in an email dated October 25, 2002, Blackwell wrote, "[I] believe this is where we left off [the employment contract

10

discussions] some time ago, with *the major unresolved element being the valuation methodology* at the time of my departure." [Emphasis added]

Blackwell characterized the documents and emails in 2000 and 2002 as proposing "replacement deals," not as describing the 1999 oral agreement. He said they "shook hands" on the 1999 oral agreement, and, although Powell had said she would put it in writing, she never did. In 2000, he explained, Powell had become more comfortable with the "equity" concept[3] and thus asked him to call Playoff's attorneys and see if they could reach a "replacement deal." Another reason for a "replacement deal," he said, was for potential tax advantages for Powell. In 2002, he said, Powell wanted to pull money out of the business and delay payment of his 25 percent. It wasn't that she did not

---

[3] From the time of his initial interview with Powell, Blackwell acknowledged, he wanted to pursue some "upside" as well as an "equity interest" in Playoff, and his discussions with Powell in that regard continued both before and after they reached the oral agreement of 1999 as found by the jury. Blackwell acknowledged that the oral agreement did not give him an equity interest. Some three months after the handshake deal as found by the jury, he was again proposing an equity deal. He emailed Playoff's lawyers on March 23, 2000, proposing a limited partnership with an equity interest for himself, with the value of Playoff to be determined "by appraisal."

Blackwell's efforts continued through the next two years with proposals to accountants and lawyers of the companies to provide him with an equity interest in the Playoff entities as well as alternative bonus plans for payment of 25 percent of after-tax distributions on sale or termination, virtually identical to the 1999 agreement terms.

want to pay him, Blackwell said, but that she wanted to "postpone it for some time."

Except for the provisions of the proposals that would have provided Blackwell some equity interest, nothing in the documents, emails, or Blackwell's testimony indicates that the proposed "replacement" agreements were any different from the 1999 oral agreement with respect to valuing the entities. And the documents and emails are uncontradicted. It is inescapable that even Blackwell contemplated that fair market value of the entities would be determined by a specific formula yet to be determined by additional negotiation and agreement between the parties.

Though the evidence that the method of valuation remained to be determined might be considered contrary to the jury's verdict, neither a reasonable jury nor a court could ignore it. *See Cent. Ready Mix Concrete Co.*, 228 S.W.3d at 651 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 821 (Tex. 2005) (holding court must consider evidence that jury could not disregard that is contrary to verdict in no-evidence review)). Moreover, Blackwell's uncontroverted admissions in these statements are not contrary to and do not conflict with the jury's finding of the agreement in answer to Question No. 1. Instead, his admissions establish that, in addition to the terms agreed upon, the agreement would ultimately contain an additional term on which the parties had

12

not yet reached an agreement–how to determine fair market value of the companies in the event his employment was terminated. "Evidence is not conflicting just because the parties cannot agree to it. For example, . . . evidence showing the terms of one loan does not conflict with undisputed evidence that the parties never reached an agreement regarding the terms of another." *City of Keller*, 168 S.W.3d at 821 (citing *T.O. Stanley Boot Co.,* 847 S.W.2d at 222)).

In other words, Blackwell's admissions show that, at most, the alleged agreement left a material matter open for future adjustment and agreement that never occurred. *See Fort Worth ISD*, 22 S.W.3d at 846. Because this evidence established that the parties never reached an agreement on an additional material term, the agreement fails for "indefiniteness" as a matter of law. *See T.O. Stanley Boot Co.*, 847 S.W.2d at 222.

The Tennessee court of appeals held an agreement too indefinite to enforce under similar facts in *Four Eights, LLC v. Salem*, 194 S.W.3d 484 (Tenn. Ct. App. 2005). There, the parties entered into a lease agreement with an option to purchase the leased premises for "its then fair market value." *Id.* at 486. The lease further provided that "[t]he Fair Market Value must be determined by the Lessor and Lessee, negotiating in good faith . . . ." *Id.* When the lessee sued the lessor to enforce the purchase option, the trial court

13

ruled that the agreement was too indefinite to enforce. *Id.* The court of appeals affirmed, holding that while "fair market value" has a common meaning, the lease provision that fair market value must be determined through good-faith negotiation was an unenforceable agreement to agree:

> [I]f the parties had simply utilized the term "fair market value," then the Court could have ascertained the same based on common usage. By adding the provision that "Fair Market Value *must be determined* by the Lessor and Lessee, negotiating in good faith" . . . , the parties basically made an "agreement to agree" to something in the future, and such agreements have generally been held unenforceable, both in this jurisdiction and others.

*Id.*; *see also Connor v. Harless*, 626 S.E.2d 755, 758 (N.C. Ct. App. 2006) (holding lease agreement with option to purchase premises at "fair market value" based on two appraisals too indefinite to enforce because agreement did not contain additional provisions stating how to proceed if appraisals produced vastly different values).

Blackwell argues that the term "fair market value" is sufficiently definite because the term is defined by an IRS revenue ruling and because expert testimony defined the term at trial.[4] Contracts are presumed to incorporate

---

[4] Blackwell also argues—in two sentences—that the defendants waived any indefiniteness in fair market value because they invited error by requesting a jury question containing the term—a question identical to the one the trial court actually submitted. This argument fails because even if the jury found (as it did) that Blackwell and Powell entered into an employment agreement that referenced the fair market value of the companies, whether the agreement is

14

regulations and laws existing at the time of execution. *Houston Lighting & Power Co. v. R.R. Comm'n of Tex.*, 529 S.W.2d 763, 766 (Tex. 1975). Blackwell points to Revenue Ruling 56-60 as defining the term "fair market value." *See* Rev. Rul. 56-60, 1959 -1 C.B. 237. Revenue Ruling 56-60 concerns the valuation of closely held corporations for estate and gift tax purposes. *Id.* §1. Although Blackwell contends that ruling 56-60 defines the term "fair market value," it is more accurate to say that ruling 56-60 provides an approach to or guidelines for determining fair market value. *See id.* § 3 (captioned "Approach to Valuation"). Section 2.02 notes that the Estate Tax Regulations and the Gift Tax Regulations "define fair market value, in effect, as the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts." *Id.* § 2.02. But section 3.01 goes on to observe that "[n]o formula can be devised that will be generally applicable to the multitude of different valuation issues," and section 7 notes that "valuations cannot be made on the basis of a prescribed formula" and that "there is no means whereby the various applicable factors in a particular case can be

---

unenforceably indefinite remains a question of law for the court. *See COC Servs., Ltd.*,150 S.W.3d at 664.

assigned mathematical weights in deriving the fair market value." *Id.* §§ 3.01, 7.

As in *Four Eights, LLC*, had the parties simply utilized the term "fair market value" in the alleged agreement, then the court and jury could have ascertained the same based on its common meaning. *See Four Eights, LLC*, 194 S.W.3d at 486. But Blackwell acknowledged that he an Powell did not have an understanding of how fair market value would be calculated with regard to the 1999 agreement, and the parties' later negotiations—as established by Blackwell's own written admissions—show that the method of valuation was a "major unresolved element." Without an agreed method of calculating fair market value, the 1999 agreement as found by the jury was unenforceably indefinite as a matter of law. *See Fort Worth ISD*, 22 S.W.3d at 846; *COC Servs., Ltd.*, 150 S.W.3d at 664. We therefore hold that the trial court did not err by granting JNOV, and we overrule Blackwell's fourth issue. Having overruled his fourth issue, we need not consider his other issues, in which he attacks the alternative bases for JNOV asserted in the defendants' JNOV motion. *See* Tex. R. App. P. 47.1.

### Powell, Playoff, and Donruss's Appeal

In a single cross-issue, the defendants argue that the trial court abused its discretion by denying their motion for attorney's fees under TCHRA.

16

TCHRA provides that "[i]n a proceeding under this chapter, a court *may* allow the prevailing party, other than the commission, a reasonable attorney's fee as part of the costs." Tex. Lab. Code Ann. § 21.259(a) (Vernon 2006) (emphasis added). When a statute states that a trial court "may" award attorney's fees, such an award is discretionary and we review the trial court's ruling under the abuse of discretion standard. *Smith v. McCarthy*, 195 S.W.3d 301, 304 (Tex. App.—Fort Worth 2006, pet. denied); *Winters v. Chubb & Son, Inc.*, 132 S.W.3d 568, 580 (Tex. App.—Houston [14th Dist.] 2004, no pet.). A trial court abuses its discretion when it acts without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985), *cert. denied*, 476 U.S. 1159 (1986).

Texas courts of appeals that have addressed attorney's fees under TCHRA have followed federal precedent, under which an employer may recover attorney's fees if the plaintiff's claims were frivolous, meritless, or unreasonable or the plaintiff continued to litigate after it became clear that his claim was frivolous. *See, e.g., Elgaghil v. Tarrant County Junior College,* 45 S.W.3d 133, 145 (Tex. App.—Fort Worth 2000, pet. denied). Attorney's fees are not appropriate under TCHRA simply because the plaintiff loses his case. *Id.* (citing *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 420, 98 S. Ct. 694, 700 (1978)). Rather, to show that a lawsuit was without merit, the defendant must

17

establish that the case was groundless or without foundation. *Id.* (affirming trial court's award of attorney's fees to TCHRA defendant when defendant established that plaintiff's claims were groundless as a matter of law). Under the equivalent federal law, a defendant is not a prevailing party when a plaintiff voluntarily dismisses his claim, unless the defendant can demonstrate that the plaintiff withdrew to avoid a disfavorable judgment on the merits. *Dean v. Riser*, 240 F.3d 505, 511 (5th Cir. 2001); *see also Butler v. MBNA Tech. Inc.*, No. Civ. 3:02-CV-1715-H, 2004 WL 389101, at *4–5 (N.D. Tex. March 1, 2004) (awarding attorney's fees under Title VII when plaintiff nonsuited claims in face of motion for summary judgment).

In *Dean*, the fifth circuit court of appeals, bemoaning the "small and almost infinitesimal universe of reported cases in which civil rights plaintiffs voluntarily dismiss their claims to avoid judgment on the merits," offered the following guidance to aid federal district courts in determining whether such dismissals warrant an award of attorney's fees:

> Upon the defendant's motion, the court must determine that the plaintiff's case was voluntarily dismissed to avoid judgment on the merits. Once this affirmative determination has been made, the defendant must then establish that the plaintiff's suit was frivolous, groundless, or without merit. Ordinarily, these inquiries can be resolved from the record developed in the case before the court, supplemented by affidavits and, only if necessary, testimonial evidence. Additional relevant evidence includes but is not limited to information concerning discovery delays and abuses, slothful

18

prosecution, negative rulings, and sanctions against the plaintiffs. Upon reaching the above two conclusions, the district court may then in its discretion award the defendant attorney's fees under § 1988.

*Dean*, 240 F.3d at 511.

Blackwell sued the defendants under TCHRA for sexual harassment in the form of unwanted sexual advances, requests to engage in a sexual relationship, requests for sexual favors, and improper questions regarding his activities and relationships outside the office; retaliation; and sex discrimination. He nonsuited his TCHRA claims the day before a hearing on the defendants' motion for summary judgment on his TCHRA claims. The defendants filed a motion for attorney's fees under TCHRA some months later.

During trial, the trial court heard extensive testimony about both the employment and romantic relationships between Blackwell and Powell. Blackwell and Powell both testified that they had an exclusive, sexual relationship and lived together from shortly after Powell hired Blackwell in 1997 until February 2002. They both testified about several instances when they renewed their romantic relationship after February 2002, but they disagreed about who instigated the reconciliations. Blackwell testified that Powell terminated his employment in November 2002 when she learned that he was romantically involved with another woman. Powell testified that she did not fire

19

Blackwell. When asked, "[I]f [Blackwell] was still in a personal relationship with you, he'd still be working there, right?" she answered, "As far as I would be concerned, that opportunity would still be available."

After the jury trial on Blackwell's claims, the trial court held a hearing on the defendants' motion for attorney's fees. The defendants offered evidence of attorney's fees incurred in defending against Blackwell's TCHRA claims in the amount of $618,554. When the trial court granted JNOV as to Donruss, it also awarded $618,554 in attorney's fees to Donruss under TCHRA and made findings of fact and conclusions of law in support of the award. But after hearing additional arguments, the trial court vacated its prior judgment and findings of fact and conclusions of law, rendered a final take-nothing JNOV in favor of all defendants, and denied the defendants' motion for TCHRA attorney's fees. Because the trial court vacated its findings of fact, we must assume that it found all facts necessary to support its denial of the defendants' motion for attorney's fees. *See Pharo v. Chambers County*, 922 S.W.2d 945, 948 (Tex. 1996)*.*

The defendants argue that the trial court abused its discretion by denying their motion for attorney's fees because they were the prevailing parties on Blackwell's TCHRA claims. Blackwell responds that his nonsuit of the TCHRA

claims was a strategic decision, not an effort to avoid an adverse judgment on the merits.

Although this court has not previously reviewed a trial court's denial of a defendant's motion for attorney's fees under TCHRA, we have previously reviewed the denial of attorney's fees under another statute that gives a trial court the discretion to award fees to a prevailing party.  In *Smith v. McCarthy*, the appellant argued that the trial court abused its discretion by denying the appellant's motion for attorney's fees under civil practice and remedies code section 16.034(a), which provides:

> In a suit for the possession of real property . . . , if the prevailing party recovers possession of the property from a person unlawfully in actual possession, the court *may* award costs and reasonable attorney's fees to the prevailing party.

Tex. Civ. Prac. & Rem. Code Ann. § 16.034(a) (Vernon 2002) (emphasis added); *Smith*, 195 S.W.3d at 304.  We held that the appellant did not meet his burden of showing that the trial court abused its discretion by denying his request for attorneys's fees because the trial court's basis for denying attorney's fees was unclear.  *Smith*, 195 S.W.3d at 304.  We further noted that because section 16.034(a) makes the award of fees discretionary —just like TCHRA—the trial court could have determined that the appellant was the

21

prevailing party as a matter of law but, in its discretion, decided to deny attorney's fees anyway. *Id.*

Likewise, in this case the basis for the trial court's denial of attorney's fees is unclear. Under the *Dean* guidelines, the trial court could have determined that Blackwell did not voluntarily dismiss his TCHRA claims to avoid judgment on the merits; or it could have determined that Blackwell's TCHRA claims were not frivolous, groundless, or without merit; or—even if it found the two foregoing factors in the defendants' favor—it could have decided, in its discretion, not to award attorney's fees. *See Dean*, 240 F.2d at 511. Because the trial court's resolution of all three factors, much less the basis for those resolutions, is unclear, the defendants have not carried their burden of showing an abuse of discretion. *See Smith*, 195 S.W.3d at 304.

The defendants argue that the reasoning in *Smith* is inapplicable to this case because our interpretation of TCHRA, unlike our interpretation of the civil practice and remedies code, must be guided by existing federal case law on the equivalent federal statute. But none of the federal or Texas cases cited by the defendants involved the situation presented here, namely, appellate review of a trial court's discretionary denial of attorney's fees when the basis for the denial is not clear from the record. *See, e.g., Butler*, 2004 WL 389101, at *6–7 (explaining why the *trial court* was exercising its discretion *in favor of*

22

awarding fees); *Elgaghil,* 45 S.W.3d at 144–45 (reviewing trial court's exercise of discretion to *award* attorney's fees under TCHRA). In the absence of other controlling or persuasive authority applicable to the case before us, it is fitting that we turn to our own precedent, *Smith*, for guidance.

We hold that the defendants have not shown that the trial court abused its discretion by denying their motion for TCHRA attorney's fees, and we overrule their sole issue.

### Conclusion

Having overruled Blackwell's fourth issue, not having reached his remaining issues, and having overruled Powell, Playoff, and Donruss's sole issue, we affirm the trial court's judgment.

ANNE GARDNER
JUSTICE

PANEL: DAUPHINOT, GARDNER, and MCCOY, JJ.

DELIVERED: October 29, 2009

23