In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-09-00069-CV

                                                ______________________________

 

 

                                        SCOTT D.
MARTIN, Appellant

 

                                                                V.

 

                                     RUBEN S. MARTIN, III, Appellee

 

 

                                                                                                  


 

 

                                       On Appeal from the 188th
Judicial District Court

                                                             Gregg County, Texas

                                                        Trial Court
No. 2008-961-A

 

                                                     
                                             

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                                        Opinion by Justice Moseley








                                                                   O P I N I O N

 

I.          FACTS AND PROCEDURAL
POSTURE

            In
the intervening years since R. S. Martin, Jr., founded the company which
eventually became Martin Resource Management Company (MRMC) in 1951, it
experienced substantial growth.  In its
current situation, MRMC is a privately held company, which is also general
partner of Martin Midstream Limited Partners, a publicly-traded company, valued
in the hundreds of millions of dollars.  It
had been successfully jointly managed for some twenty years by Ruben S. Martin,
III, and Scott D. Martin, sons of the founders (who owned or controlled all of
the voting shares and both of whom were on the five-member board of directors)
in an informal, collaborative relationship.[1]  Formal shareholder and board meetings were
infrequent and they regularly conducted votes through unanimous written
consents.  

            Basically,
an internecine power struggle over the control of MRMC arose between the
brothers. Although the nature of the brothers’ dispute is complicated,
essentially Ruben contended that Scott was trying to take control of the
company, while Scott took the position that it was Ruben’s goal to “freeze”
Scott out from corporate management.  Beginning
in 2006, the brothers’ relationship began to deteriorate regarding the general
direction of the company and their collegial relationship was finally fractured
in 2007 when Ruben decided that MRMC should seek to acquire a California
refinery, while Scott opposed the move. 
This course of events led Scott to attempt to stop the purchase by
formalizing MRMC’s corporate decision-making process, which would impose checks
on any type of unilateral control of the company by Ruben.  Meanwhile, control of the board of directors remained
in flux.  

            In an effort to
settle their dispute over corporate control, Ruben and Scott met together and
hammered out an agreement, which was monumentalized in a nineteen-paragraph
document captioned “Settlement Agreement” drafted by Scott’s attorney and
signed on January 29, 2008.[2]  Among other things, the agreement required
the brothers to negotiate a shareholder agreement in good faith for sixty days (later
extended by agreement to ninety days) and that upon completion of “all of the
obligations under this Settlement Agreement” (defined as the “Completion Date”),
certain other obligations would arise. 
Although the parties negotiated, they were unable to agree on the terms
of a shareholder agreement and none of the remaining terms have been fulfilled.

            Although
he acknowledged the failure to arrive at an agreement concerning the content of
a shareholders’ agreement, Scott characterized Ruben’s failure to perform the
other obligations set forth in the agreement as a breach of contract.  Scott brought suit to enforce the agreement,
seeking specific performance and damages.[3]  After a ten-day trial, the trial court
submitted the case to the jury on the issues of breach and damages.[4]  In doing so, the trial court impliedly found
the agreement was an enforceable contract. 
Holt Atherton Indus., Inc. v.
Heine, 835 S.W.2d 80, 83 (Tex. 1992); Burnett
v. Motyka, 610 S.W.2d 735, 736 (Tex. 1980) (per curiam) (conclusions of law
that are necessary, but not made, are deemed in support of judgment).  The jury found Ruben breached the agreement
and awarded Scott $3.2 million in damages and attorney’s fees of $1.5
million.  The judgment awarded Scott $3.2
million in accord with the jury verdict, included provisions requiring specific
performance by Ruben of certain portions of the settlement agreement, and
awarded $13,533.85 in costs to Scott. 
Ruben filed a motion for judgment notwithstanding the verdict and
alternatively a motion for new trial, contending Scott was not entitled to
judgment because the settlement agreement was unenforceable as a matter of law.
 That motion was overruled by operation
of law.

            In the race to
appeal, Scott prevailed.  In his sole
point of error, Scott claims that he was entitled to recover $16,028.15 in
costs, rather than the $13,533.85 awarded in the judgment, alleging that the
trial court had acted arbitrarily, picking a number between the cost figure
proved up by Scott and the number argued for by Ruben.  Ruben filed a cross-appeal.  In his reply brief, Ruben streamlined his
issues and argument.[5]
 While his principal brief presented four
issues, Ruben’s basic issues, as joined by Scott on cross-appeal, are whether
the January 29, 2008, settlement agreement is legally enforceable, and if so,
whether Scott was entitled to an award of both money damages and specific
performance for breach of the agreement. 
Because the settlement agreement is not enforceable as a matter of law,
we reverse the judgment of the trial court and render judgment for Ruben.  

II.        ANALYSIS

            Because
resolution of Ruben’s issues is determinative of Scott’s point of error
regarding the award of court costs, the issues raised by Ruben will be
considered first.

            In
his first issue on cross-appeal, Ruben contends the settlement agreement is an
unenforceable agreement to agree.  Scott
contends that this issue (not having been submitted to the jury) was abandoned
and, thus, waived on appeal.  We first
address the issue of whether the agreement’s enforceability was properly
preserved and then discuss the merits of the issue.  

            A.        The
Enforceability Issue Was Preserved

            The central issue
raised in this appeal is whether the parties’ January 29, 2008, settlement
agreement is an unenforceable agreement to agree.  Scott contends that Ruben abandoned the
contract formation issue by not submitting a question to the jury on this issue
and in failing to object to the absence of such a question.  This contention is based on Ruben’s concession
that he assented to the settlement agreement individually, but his assent to
its terms was not in a representative capacity. 
On appeal, Ruben places more emphasis on the enforceability of the
settlement agreement than at the trial level and relies less on the issue of
the capacity under which he was operating at the time he signed the settlement
agreement.  Because he raised this issue
in his motion for directed verdict and in his motion for judgment notwithstanding
the verdict, or in the alternative, motion for new trial, Ruben contends that
the issue of the contract’s legal enforceability has successfully been
preserved.  We agree.

            Black’s
Law Dictionary defines a “contract” as “[a]n agreement between two or more
parties creating obligations that are enforceable or otherwise recognizable at
law.”  Black’s
Law Dictionary 365 (9th ed. 2009). 
According to the Restatement of Contracts, the terms “agreement” and “contract”
are not synonymous; “agreement” refers to a “manifestation of mutual assent on the
part of two or more persons,” whereas the term “contract” refers to “a promise
or a set of promises for the breach of which the law gives a remedy, or the
performance of which the law in some way recognizes a duty.”  Restatement
(Second) of Contracts §§ 1, 3 (1981); see, e.g., Wiley v. Bertelsen,
770 S.W.2d 878, 882 (Tex. App.––Texarkana 1989, no writ) (noting that the term “agreement”
is more broad than the term “contract” and that it is possible for parties to
enter into an agreement but still not have a contract).  Although it is possible to enter into an
agreement without forming a contract, the converse is not true.

            Texas
Pattern Jury Charge 101.1 sets forth the basic question regarding the existence
of a contract.  Texas Pattern Jury Charges, Business, Consumer, Insurance &
Employment, PJC 101.1 (2008).  The
commentary to this basic question of the existence of a contract states that
101.1 “submits the issue of the existence of an agreement.  It should be used if there is a dispute about
the existence of an agreement or its terms and a specific factual finding is
necessary to determine whether the agreement constitutes a legally binding
contract.”  Id.  Rather than contending
that a fact issue (which would require resolution by a jury) existed with respect
to whether the contract was legally binding, Ruben maintained that the contract
was not enforceable as a matter of law. 

            The
failure to object to the omission of a question on contract formation, when
taking the position that no contract exists in the first instance, is
inconsistent with a waiver of that position. 
Ruben’s concession that a fact issue did not exist on the intent to
agree does not, however, resolve the issue of whether the contract is legally
enforceable.  In essence, Ruben complained
that there was no evidence to warrant the submission of a question of contract
formation to the jury because, as a matter of law, the contract was
unenforceable.  The question of whether
an agreement is an unenforceable agreement to agree is a question of law, not a
question for the jury.  See Mickens v. Longhorn DFW Moving, Inc.,
264 S.W.3d 875, 880 (Tex. App.––Dallas 2008, pet. denied) (“Whether a contract
is legally enforceable is a question of law for the court—not a fact issue for
the jury.”); Meru v. Huerta, 136
S.W.3d 383, 390 (Tex. App.––Corpus Christi 2004, no pet.) (“[W]hether a
particular agreement is an enforceable contract is generally a question of law.”).


            Moreover,
Ruben properly preserved the issue of whether the contract was legally
enforceable as a matter of law.  To
preserve an issue of law, the appellant must
raise the issue through one of the
following:  (1) a motion for directed
verdict; (2) a motion for judgment notwithstanding the verdict; (3) an
objection to the submission of the question to the jury; (4) a motion to
disregard the jury’s answer to a vital fact question; or (5) a motion for new
trial.  See Cecil v. Smith, 804 S.W.2d 509, 510–11 (Tex. 1991);
United Parcel Serv., Inc. v. Tasdemiroglu,
25 S.W.3d 914, 916 (Tex. App.––Houston [14th Dist.] 2000, pet. denied).  Ruben filed a motion for directed verdict on
the issue of whether the contract was legally enforceable based on its status
as an executory contract both at the conclusion of the plaintiff’s case-in-chief
and at the conclusion of the evidence. 
On each occasion, the motion was overruled.  In addition, Ruben filed a motion for
judgment notwithstanding the verdict and, alternatively, motion for new trial
relying on this issue.  This motion was
overruled by operation of law.  

            Because
Ruben raised this issue of law by filing the appropriate motions, the issue of
the agreement’s enforceability was properly preserved.

            B.        The Settlement Agreement Is
Unenforceable as a Matter of Law

            The
primary issue in this case is whether the language expressly set forth in the
agreement was sufficiently definite to be enforceable against Ruben.  Whether a particular agreement is an
enforceable contract is a question of law reviewed de novo.  Perry
Homes v. Cull, 258 S.W.3d 580, 598 (Tex. 2008); Elijah Ragira/VIP Lodging Group, Inc. v. VIP Lodging Group, Inc.,
301 S.W.3d 747, 754 (Tex. App.––El Paso 2009, pet. denied).  On appellate review, we are not required to
give any particular deference to the trial court’s legal conclusion that the
contract was legally enforceable.  See Cap Rock Elec. Co-op., Inc. v. Tex.
Utils. Elec. Co., 874 S.W.2d 92, 99 (Tex.
App.––El Paso 1994, no pet.).  Rather, we
are required to independently evaluate the trial court’s legal
determination.  Id.  Legal conclusions of a
trial court are to be reversed only when they are erroneous as a matter of
law.  America’s
Favorite Chicken Co. v. Samaras, 929 S.W.2d 617, 622 (Tex. App.––San Antonio
1996, writ denied).  

            Even
though Ruben acknowledged (with few qualifications) his assent to every term of
the settlement agreement, he maintains that by its express terms, the agreement
is not a final, enforceable contract; he maintains that it was, rather, a mere
listing of areas the two brothers planned to address over the next few months
in an attempt to resolve their disputes. 
The first paragraph of the agreement calls for the negotiation of a
shareholder agreement binding on all MRMC shareholders.[6]  It provides that:

(1) Scott and Ruben will negotiate a shareholder
agreement (“Shareholder Agreement”) that will be applicable to all
shareholders.  It will provide that Ruben
will continue to be the CEO of Martin Resource Management Corporation (“MRMC”)
but the authority to conduct the day to day operations of MRMC will be subject
to those responsibilities that are delegated to him by the Board of Directors
of MRMC.  Scott shall have the ability to
determine what authority the Board will delegate to Ruben.  Scott’s duties will need to be more clearly
defined and delegated by the Board as well. 
The Shareholders Agreement will contain provisions typically found in
large, complex corporations, including provisions governing liquidity for all
the shareholders.  The parties will
negotiate in good faith the provisions of the Shareholders Agreement and try to
reach agreement on some form of buy-sell provisions contained therein.  Such buy-sell provision will be subject to a
1 yr. lockup period.  Finally, the
Shareholder Agreement will require at least quarterly Board meetings.

 

            It
is undisputed that the parties never arrived at an agreement for the content of
a shareholder agreement and never executed one.[7]  

            Paragraphs
five through nine, eleven, and thirteen through fifteen each contain provisions
that are triggered by the “Completion Date,” as that term is defined in the
agreement.[8]  The “Completion Date” is defined as the
completion “of all of the obligations under this Settlement Agreement.”  The dependent provisions include:  (1) Wes Skelton’s resignation as MRMC ESOP
Trustee; (2) Scott’s resignation as trustee for Ruben’s family trusts; (3) MRMC’s
extension of employment agreements to Scott and Ruben; (4) Scott’s, Ruben’s,
and the MRMC board members’ execution of mutual releases from any and all
claims related to issues subject to the agreement; (5) Ruben’s transfer of one
share of MRMC stock to Scott; (6) Neumeyer’s and Skelton’s resignations from
MRMC’s board, to be replaced by Ruben’s and Scott’s respective designees; (7)
the extension of $2,000,000.00 loans to Scott and to Ruben, respectively, upon
approval of Amegy (MRMC’s financing arm); (8) reimbursement by MRMC of all
legal fees incurred by Scott, Ruben, and Margaret Martin related to the negotiations;
and (9) conversion of all outstanding MRMC stock options to “non-voting,”
to last until the termination of Angela’s Trust.[9]

            The
bedrock of the instant dispute is that Ruben and Scott differ over the meaning
of paragraph one of the settlement agreement. 
The interpretation of this paragraph is central to the issue of the
agreement’s enforceability.  Ruben
maintains that the plain meaning of the settlement agreement is that Scott and
Ruben would spend sixty days (later extended to ninety days) to negotiate a
shareholder agreement (paragraph one) and other items that would resolve the
issues between them (the remaining provisions of the agreement).  Although the parties negotiated for a period
of ninety days, no shareholder agreement was reached, and none of the remaining
agreements were carried out.[10]  Ruben thus contends that because the
obligations under the settlement agreement (including the negotiation of a
shareholder agreement) were not completed, the “Completion Date” never
occurred.  As a result, none of the
dependent provisions were triggered.[11]  

            When
an agreement leaves material matters open for future adjustment and agreement
that never occur, it is not binding on the parties and merely constitutes an
agreement to agree.  Fort Worth Indep.
Sch. Dist. v. City of Fort Worth,
22 S.W.3d 831, 846 (Tex. 2000), superseded
by statute on other grounds, Vantage
Sys. Design, Inc. v. Raymondville Indep. Sch. Dist., 290 S.W.3d 312, 316
(Tex. App.––Corpus Christi 2009, pet. filed); Sadeghi v. Gang, 270 S.W.3d 773, 776 (Tex. App.––Dallas 2008, no
pet.).  Said another way, a party cannot
accept an offer so as to form a contract unless the terms of that contract are
reasonably certain.  Fort Worth Indep. Sch. Dist., 22 S.W.3d at 846.  Contract terms are reasonably certain “if
they provide a basis for determining the existence of a breach and for giving
an appropriate remedy.”  Restatement (Second) of Contracts §
33(2) (1981).  If an alleged agreement is
so indefinite as to make it impossible for a court to fix the legal obligations
and liabilities of the parties, it cannot constitute an enforceable
contract.  Playoff Corp. v. Blackwell, 300 S.W.3d 451, 455 (Tex. App.––Fort
Worth 2009, pet. denied).

            Conversely,
enforceable settlement agreements need only “contain sufficient terms to
determine the parties’ obligations but [are] not required to resolve all
disputed issues.”  W. Beach Marina, Ltd. v. Erdeljac, 94 S.W.3d 248, 258–59 (Tex. App.––Austin
2002, no pet.).  “Where the evidence
shows that the parties intended to enter into an agreement, the courts should
find the contract to be definite enough to grant a remedy provided that there
is a certain basis for determining the remedy.” 
America’s Favorite Chicken Co.,
929 S.W.2d at 623.  Parties may therefore
agree upon some contractual terms, understanding them to be an agreement, and
leave other contract terms to be made later. 
T.O. Stanley Boot Co. v. Bank of
El Paso, 847 S.W.2d 218,  221 (Tex.
1992).  It is only when an essential term
is left open for future negotiation that there is nothing more than an
unenforceable agreement to agree.  Id. 
The parties here disagree regarding the enforceability of the contract
based on (1) whether the completion date, as that term is defined in the
agreement, was reached; and (2) whether the shareholder agreement was an
essential term of the overall agreement. 

                        (1)        A Completion Date Was Not Reached 

            Ruben
contends the parties, as a part of their “obligations” under the settlement
agreement, were required to not only negotiate, but to actually reach a
shareholder agreement, reduce it to writing, sign it, and adopt it as an
antecedent to the other obligations. 
Without this obligation being brought to fruition, a “Completion Date”
never happens.  Without a “Completion Date,”
none of the nine dependent provisions take place.  In this scenario, the trial court could not
determine what the parties’ rights and obligations would be under the
settlement agreement because the court could not possibly know what agreement
the parties would have negotiated. 

            Scott
contends the obligation was simply to negotiate (but not necessarily agree upon
and adopt) a shareholder agreement, and the parties had sixty days in which to
do so (later extended to ninety days). 
According to Scott, the “Completion Date” is reached by fulfilling the
obligation to negotiate as set out by paragraph number one of the settlement
agreement.  In support of this position,
Scott relies on Geophysical Micro
Computer Applications (Int’l) Ltd. v. Paradigm Geophysical Ltd., No.
05-98-02016-CV, 2001 WL 1270795, at *6 (Tex. App.––Dallas Oct. 24, 2001, pet.
denied) (not designated for publication) (finding an obligation to “negotiate
in good faith” satisfied “the mutuality of obligation requirement as a matter
of law”). 

            Paradigm involved a letter of intent
regarding the purchase of computer software. 
The letter clearly identified the asset to be sold, its price and
adjustments to the purchase price, royalties, a method to calculate the closing
date, and the payment of financing terms. 
The letter of intent also provided for “other terms” regarding due
diligence, responsibility for closing documents, and other “necessary
commercial terms.”  There was no evidence
in this summary judgment case that the “other terms” or other “necessary
commercial terms” were essential for the contract.  The court held that the trial court
improperly granted summary judgment because the evidence was disputed and the
language in the document was inconclusive on whether the parties intended the
agreement to be a memorialization of the parties’ agreement or a condition
precedent to the formation of a contract.  Id. 
Paradigm also moved for summary judgment on the basis that the letters
were not enforceable because they lacked mutuality of obligation, i.e., they
were subject to the parties’ corporate approval, and Paradigm’s board had
disapproved and rejected the transaction. 
Because the letter required the parties to negotiate in good faith, the
mutuality of obligation requirement was satisfied as a matter of law; the issue
of whether Paradigm discharged this obligation in good faith was a question of
fact.  Id.  Because this case
focuses on mutuality of obligations, and not whether an agreement to negotiate
in good faith amounts to an enforceable contract, it is not persuasive.  Mutuality of obligation does not render an
otherwise unenforceable contract, lacking essential terms, enforceable.  

            Ruben
maintains that an agreement to negotiate in the future is unenforceable, even
if the agreement calls for a good-faith effort in negotiations, citing John Wood Group USA, Inc. v. ICO, Inc.,
26 S.W.3d 12, 21 (Tex. App.––Houston [1st Dist.] 2000, pet. denied).  This case involved a letter agreement for the
sale of corporate assets, which stated that the essential terms of the proposed
sale were “not binding.”  The jury
awarded damages for breach of contract. 
On appeal, the appellant maintained that even if the sale provisions
were held to be unenforceable—as they were—the damages should nevertheless
stand because the Wood Group breached the good-faith clause of the letter
agreement, by which both parties intended to be bound.  In support of that proposition, appellant
relied on Illinois law, under which agreements to negotiate toward the
formation of a contract are themselves enforceable as contracts.  The court recognized, however, that under
Texas law, an agreement to negotiate in the future is unenforceable, even if
the agreement calls for a “good faith effort” in the negotiations.  Id.
at 21 (citing Radford v. McNeny, 129
Tex. 568, 104 S.W.2d 472, 474 (1937); Maranatha
Temple, Inc. v. Enter. Prods. Co., 893 S.W.2d 92, 104 (Tex. App.––Houston
[1st Dist.] 1994, writ denied) (presence of term “good faith effort” in
agreement not talismanic; its presence does not automatically mean the
provision that contains this phrase is enforceable—an agreement to enter into
good-faith negotiations in future not enforceable)).  

            Scott’s
argument, though creative, does not conform to Texas law.  The shareholder agreement must be executed,
not merely negotiated.  The agreement
itself supports this conclusion. 
Paragraph one states that the brothers “will negotiate a shareholder
agreement” that “will be applicable to all shareholders.”  Since the goal of negotiation is agreement, if the parties are
required to “negotiate an agreement,” they must necessarily and ultimately
conclude with a negotiated agreement. 
Otherwise, the parties have only attempted to negotiate an
agreement.  Additionally, paragraph one
contains obligatory language which supports the conclusion that its terms
require the execution of a shareholder agreement.  It requires that (the shareholder agreement) “will
provide,” “will contain,” and “will require.”  Imperative statements such as these envision
the object to be accomplished will, in fact, be accomplished.  In failing to negotiate a shareholder
agreement, the parties fell short of accomplishing this goal.  Thus, the completion date—meaning completion “of
all of the obligations under this Settlement Agreement”—was not reached because
the obligation of executing a shareholder agreement was not completed.  Without a completion date, Ruben contends the
agreement is merely an agreement to agree in the future, which is not legally
binding.  See Fort Worth Indep. Sch. Dist., 22 S.W.3d at 846.  

            However,
if the shareholder agreement provision of the agreement is not essential, as
Scott contends, the agreement can nevertheless be enforced.  See
T.O. Stanley Boot Co., 847 S.W.2d at 221
(only when essential term left open for future negotiation is agreement an
unenforceable agreement to agree).  We,
therefore, must determine whether the shareholder provision is essential to the
overall settlement agreement.  

                        (2)        The Shareholder Agreement Is Essential
to the Settlement Agreement

            Ruben maintains
that each provision of the settlement agreement is essential because all
obligations, i.e., each provision of the agreement, must be completed in order
to reach the completion date.[12]  Even so, Ruben characterizes the shareholder
provision as the “pearl” of the agreement, an essential provision.  The issue of essential contractual provisions
was recently addressed in Playoff Corp.,
300 S.W.3d 451.  

            In
that case, Blackwell brought suit against Playoff, a sports trading-card
company, for breach of contract.  Id. at 453.  After finding that a breach of contract
occurred, the jury found damages of $6.1 million, but the trial court granted a
take-nothing judgment notwithstanding the verdict, holding that the agreement
was “legally unenforceable.”  Id. at 454.  The Fort Worth court affirmed.  The matters in dispute in Playoff involved an employment
agreement, the most hotly contested provision of which involved the issue of
payment by Playoff, the employer, to Blackwell, the employee.  That provision was summarized as follows:

Playoff . . . would pay Blackwell 25% of the
proceeds from the sale of Playoff or entities contemplated to be formed by the
parties, if any, after reducing the proceeds from the sale by $ 5,000,000.00
(Playoff's agreed fair market value at the time of the alleged employment
agreement); or 25% of the fair market value of Playoff or entities contemplated
to be formed by the parties, if any, after reducing the fair market value by $
5,000,000.00, on the last day of his employment if Playoff or any entity
contemplated to be formed by the parties terminated Blackwell's employment.

 

Id at 453.  Because the term “fair
market value” was to be determined by “additional negotiation and agreement between
the parties,” the “alleged agreement left a material matter open for future
adjustment and agreement that never occurred.” 
Id. at 457.  Consequently, the agreement was unenforceable
as a matter of law.  Id.

            In contrast to Playoff, Scott maintains that while the
parties contemplated future negotiations on some issues, including the
shareholder provision, future negotiations do not negate contractual intent as
a matter of law.  Komet v. Graves, 40 S.W.3d 596, 601–02 (Tex. App.––San Antonio
2001, no pet.).  In that case, an
employment agreement set out the material terms of the employee’s salary and
benefits, but also provided the following provisions:  “[a] commission schedule structure shall be
created and mutually agreed to and incorporated into this agreement” that was “to
be determined by a future document” and an “[e]quity agreement to be determined
in subsequent document.”  Id. at 599.  Because the agreement set out the effective date,
salary, health insurance provisions, and vacation time and other benefits, the
parties’ obligations were sufficiently outlined.  In Komet,
the court determined that the percentages were not material and therefore could
“be left open for future negotiations without destroying the contract’s
effectiveness.”  Id. at 602.  Because Komet determined that no essential
provision was left to future negotiation, the contract was enforceable.  

            Scott
makes the same argument in this case.  He
contends that the shareholder agreement was not essential to the overall
agreement because it was not imperative or indispensible, pointing out that the
installation of a four-member board was not predicated on the existence of a
shareholder agreement[13]
(which, according to Scott, was the key essential term to the entire
agreement).[14]  To effectuate the settlement agreement, the
four-member board of directors would come first, and then the other documents
would “fall into place.”[15]  Therefore, even when negotiations on the
shareholder agreement failed, the remaining provisions of the settlement
agreement were––in Scott’s estimation––enforceable.

            What
terms are “material” or essential to a contract should be determined on an
agreement-by-agreement basis.  T.O. Stanley Boot Co., 847 S.W.2d at 221
(“Each contract should be considered separately to determine its material
terms.”).  A close corporation such as
MRMC may, by statute, be managed either by a board of directors or in the
manner provided for in a shareholders’ agreement.  Tex.
Bus. Corp. Act Ann. art. 12.31(A)(2) (Vernon 2003).[16]  By statute, a shareholder agreement may
restrict the discretion or powers of the board of directors.  Or, the agreement can eliminate the board of
directors and authorize the business and affairs of the corporation to be
managed by one or more of its shareholders or other persons.  Tex.
Bus. Orgs. Code Ann. § 21.101(b)(1). 


            Paragraph
one of the settlement agreement provides that the shareholder agreement will
delegate responsibility to Scott to determine what authority the board of
directors will delegate to Ruben to conduct the day-to-day operation of the
corporation.  Scott’s duties are to be
more clearly defined and delegated by the board.  Further, the agreement will contain
provisions “typically found in large, complex corporations, including
provisions governing liquidity for all shareholders.”  The agreement will also include buy-sell
provisions, “subject to a 1 yr. lockup period.” 
Sufficient detail regarding corporate management and financial
governance is built into paragraph one to convince this Court that the
shareholder agreement was essential to the overall settlement agreement.  

            Further,
the proposed shareholder agreements drafted during the course of the parties’
negotiations are detailed and comprehensive. 
The most recent (failed) draft of the shareholder agreement was thirty
pages in length with a detailed table of contents.  The draft shareholder agreement addressed
restrictions on disposition of shares, voluntary lifetime transfers,
involuntary lifetime transfers, purchase of shares on the death of a
shareholder or spouse of a shareholder, general provisions relating to
transfers, voting agreements, covenants of the corporation, and a number of
miscellaneous provisions.  Each of these
areas covered additional sub-topics in meticulous detail; each of these
provisions can be excruciatingly complex and subject to intense
negotiation.  

            While
Scott maintains the shareholder agreement is not essential, a plain reading of
the entire agreement indicates otherwise.  The shareholder agreement, as envisioned in
the settlement agreement and as reflected by the drafts produced in
negotiations, would be the foundational document of MRMC and would define the
parties’ rights vis-à-vis each other and MRMC. 
Moreover, the shareholder agreement was fundamental to the enforcement
of nine of the remaining eighteen paragraphs which, by their express language,
are dependent on completion of all of the obligations under the agreement. 

            Because
the settlement agreement leaves this essential provision open for future
agreement that never occurred, it is not binding and merely constitutes an
agreement to agree in the future.  See Fort Worth Indep. Sch. Dist., 22
S.W.3d at 846; Playoff Corp., 300
S.W.3d at 455; Meru v. Huerta, 136
S.W.3d 383, 391 (Tex. App.––Corpus Christi 2004, no pet.).  As such, it cannot be enforced. 

            Because
we find the settlement agreement to be unenforceable as a matter of law, we
need not address the issue of whether the trial court erred in (1) awarding
money damages and specific performance for a breach of contract and (2)
awarding costs.

            We
reverse the judgment of the trial court and render a take-nothing judgment.

 

 

                                                                        Bailey
C. Moseley

                                                                        Justice

 

Date Submitted:          October
13, 2010

Date Decided:             November
3, 2010











[1]Ruben
was President, Chief Executive Officer, and Chairman of the Board of MRMC, an
MRMC shareholder, and the trustee of the R. S. Martin’s Children Trust No. 1
(Angela’s Trust).  Scott was Executive
Vice President of MRMC, a member of the Board of Directors, an MRMC
shareholder, and the trustee of the Ruben S. Martin, III, Dynasty Trust
(Dynasty Trust).  So long as Ruben was
trustee of Angela’s Trust and could control the votes of those shares, he had a
slight voting advantage over Scott. 
However, the time for the termination of the trust was fast approaching
and the brothers’ mother had the ability to remove Ruben as trustee and name
another person in his stead.





[2]The
terms of the “Settlement Agreement” are summarized as follows:

 

Paragraph one:  “Scott
and Ruben will negotiate a shareholder agreement . . . .”  

 

Paragraph two: 
“The parties shall work together to better organize the use of MRMC
airplanes.”  

 

Paragraph three:  “Scott may elect to sell any Colorado house
and the proceeds shall be split according to ownership in such house.”

 

Paragraph four:  “Scott and Ruben shall be permitted to invite
anyone to the MRMC Board meetings.”  

 

Paragraph five:  “Upon completion of all of the obligations
under this Settlement Agreement (the “Completion Date”), Wes Skelton
shall resign as a co-trustee of the ESOP and Ruben and Scott shall remain as
the sole co-trustees.” 

 

Paragraph six:  “Upon
the Completion Date, Scott shall resign from all trustee positions relating to
any trust of Ruben’s and a successor trustee shall be appointed at Ruben’s
discretion.”  

 

Paragraph seven:  “On or before the Completion Date, Scott and
Ruben shall each be given Employment Agreements with equal compensation and
severance packages.” 

 

Paragraph eight:  “Upon the Completion Date, Scott, Ruben and
the officers and directors of MRMC shall execute mutual releases from any and
all claims related to the issues subject to this Agreement.”

 

Paragraph nine:  “Upon the Completion Date, Ruben will transfer
one share of common stock of MRMC to Scott.” 

 

Paragraph ten:  “Scott
and Ruben will be the MRMC representatives appointed to the Arcadia joint venture
board of directors.”  

Paragraph eleven:  “Upon the Completion Date, Don Neumeyer and
Wes Skelton will resign from the MRMC Board. 
Ruben and Scott will each have the right to appoint 1 additional Board
member . . . . This shall be accomplished through a Unanimous Consent of
Shareholders.” 

 

Paragraph twelve:  “On the Effective Date, Ruben and Scott shall
be appointed as co-investment trustee’s [sic] of Angela’s Trust.”  

 

Paragraph thirteen:  “Upon the Completion Date, Ruben and Scott
will each receive equal unsecured loans of up to $2,000,000 from MRMC, subject
to Amegy approval on all of the terms and conditions of such loan.”  

 

Paragraph fourteen:  “Upon the Completion Date, Scott, Ruben and
Margaret Martin will be reimbursed by MRMC for all legal, consulting and other
related expenses incurred in connection with the negotiation of the issues that
are the subject of this Settlement Agreement.” 


 

Paragraph fifteen:  “Upon the Completion Date, any and all
outstanding stock options in MRMC shall be converted to non-voting shares upon
exercise.”  

 

Paragraph sixteen:  “There will be no shareholder votes except by
unanimous consent until the Completion Date.” 


 

Paragraph seventeen:  “Board action for MRMC will only be taken
through unanimous consent until the Completion Date.”  

 

Paragraph eighteen:  “Scott and Ruben will use their good faith
efforts to work through counsel to document the agreements contained herein
within sixty (60) days of the Effective Date.” 


 

Paragraph nineteen: 
“Angela will become employed by MRMC (at a location of her choosing), if
she wishes.” 





[3]Scott
maintains that because April 30, 2008, marked the end of the ninety-day
negotiation period under the agreement, this was the date upon which all
obligations under the agreement were to be fulfilled, i.e., the completion
date.  In his third amended original
petition, Scott alleged that “Ruben has failed and refused to perform the
obligations and undertakings required of him under the terms of the Settlement
Agreement.” 

 





[4]The
jury was also asked to determine whether Ruben and Scott were ultimately able
to vote 100% of the voting shares of MRMC on the date of the agreement, whether
Ruben and Scott were ultimately able to vote 67% of the voting shares on the
date of the agreement, and whether by virtue of their shared voting power on
the date of the agreement, Ruben and Scott were able to select and remove
officers and directors of MRMC as well as the trustees for the Martin Resource
Management Employee Stock Ownership Trust. 
The jury’s positive response to these issues, as well as to the monetary
damage question, is not in dispute.





[5]In
his sur-reply brief, Scott contends Ruben improperly presented new issues on
reply, in violation of Rules 38.1(f) and 38.3 of the Texas Rules of Appellate
Procedure.  Tex. R. App. P. 38.1(f) (“The [initial]
brief must state concisely all issues or points presented for review.”); Tex. R. App. P. 38.3 (reply brief
should address matters raised in appellee’s brief).  Because Ruben fully briefed the issues
regarding the agreement’s legal enforceability and the propriety of the award
of specific performance in addition to monetary damages, these issues are
squarely before this Court.





[6]Shareholder
agreements in Texas are subject to the requirements of Chapter 21, Subchapter C
of the Texas Business Organizations Code—and require approval and ratification
by all shareholders, among other things, to be effective.  Tex.
Bus. Orgs. Code Ann. § 21.101(b) (Vernon 2010 pamphlet). 





[7]Paragraphs
two, three, and four of the agreement address treatment of MRMC assets, such as
use of the MRMC planes, sale of any “Colorado house,” and Scott’s and Ruben’s
ability to invite whomever they wish to attend MRMC Board meetings.  

 





[8]Each
of these paragraphs is prefaced by the language, “Upon the Completion Date,” or
“On or before the Completion Date.”





[9]The
remaining paragraphs—ten, sixteen, seventeen, and nineteen—require that the
MRMC Board could take action only by unanimous consent through the “Completion Date”;
provide that Angela Alexander may be employed by MRMC at a location of her choosing,
and state that both Scott and Ruben will be the MRMC representatives appointed
to the Arcadia joint venture board of directors.  

 





[10]Ruben
points out that many of the provisions of the settlement agreement require MRMC
board approval.  Darren Inoff, attorney
for Scott, drafted the settlement agreement. 
Inoff provided Scott with a list of decisions that required MRMC board
approval.  Those decisions include:  the election or removal of officers from the
corporation; entering into or amending any employment or severance agreement
with any officer or employee of the corporation, and all compensation programs
(including base salaries and bonuses) for officers and key employees; the
purchase, sale, lease, transfer or other acquisition or disposition of assets
(including equity interests in any entity) in a transaction or series of
transactions in excess of a given amount; any real estate lease or purchase;
any commencement or settlement of any litigation; and approval of any other
item specifically required elsewhere in the shareholder’s agreement, bylaws, or
articles of incorporation.  These
categories of actions requiring board approval apply to paragraphs three, five,
seven, eight, eleven, thirteen, fifteen, sixteen, and seventeen.  





[11]Paragraph
eighteen of the settlement agreement provides that “Scott and Ruben will use
their good faith efforts to work through counsel to document the agreements
contained herein within sixty (60) days of the Effective Date.”





[12]The
definition of “Completion Date” as the completion of all obligations under the
agreement, in light of the nine provisions to be concluded upon the completion
date, creates a never-ending chain of events which cannot, logically, result in
a completion date.  





[13]The
provision requiring a four-member board is not a part of the shareholder
agreement; it is contained in paragraph eleven of the settlement
agreement.  Paragraph eleven states:

 

Upon the Completion Date, Don
Neumeyer and Wes Skelton will resign from the MRMC Board.  Ruben and Scott will each have the right to
appoint 1 additional Board member, it being assumed (but not required) that Bob
Bondurant will be Ruben’s appointment and Mike Gayler will be Scott’s
appointment.  Courtney Stovall and Angela
Alexander shall also be appointed as advisory, non-voting Board members.  This shall be accomplished through a
Unanimous Consent of Shareholders.  Under
no circumstances will these changes constitute a Change of Control under any
employment agreement, retention or severance agreement or any other agreement
entered into by MRMC.  The current Board
shall execute a written consent authorizing these Board changes to confirm that
these changes shall not constitute a Change of Control.  The composition of the Board cannot be
changed until The R.S. Martin Jr., Children’s Trust No. One f/b/o Angela Santi
Jones (also known as Angela J. Alexander) (“Angela’s Trust”) terminates
upon which time any shareholder shall be entitled to call a special meeting for
the purpose of proposing a new slate of directors of the MRMC Board.  The Bylaws shall be amended accordingly to
permit this Board composition (since Bylaws currently require seven (7) Board
members).

 





[14]After
a hard fought battle, Scott and Ruben agreed on a board of Scott and his
designee and Ruben and his designee.  It
was not Scott’s intention that the four-member board be contingent on or
subject to the successful negotiation of a shareholder agreement.  The four-member board provision does appear
to be an essential provision of the overall agreement, given the degree of
specificity it contains.  That does not,
however, resolve the issue of whether the shareholder provision is essential to
the settlement agreement.  

 





[15]Both
Scott and Ruben testified they could vote 100% of the shares of MRMC.  Scott testified, with respect to paragraph
eleven, that if Skelton did not want to resign, he could be made to
resign.  Scott and Ruben controlled the
MRMC board vote on January 29, 2008, so any provisions requiring action by the
board of directors could be effectuated by their board votes.  The MRMC board appoints the trustees of the
ESOP as well, so the board could also effectuate changes to the ESOP.  





[16]This
section of the Business Corporation Act expired on January 1, 2010, but was in
effect at the time the settlement agreement was executed.  Tex.
Bus. Corp. Act Ann. art. 11.02
(Vernon Supp. 2010).