Affirmed as
Modified and Memorandum Opinion filed June 7, 2011.

 

In
The

Fourteenth
Court of Appeals



NO. 14-10-00081-CV



Xing Zhao, Appellant 

v.

The Hudgens
Group, Inc., Appellee 



On Appeal from County
Court at Law No. 3

Galveston County, Texas

Trial Court
Cause No. 59,146



 

MEMORANDUM OPINION

Xing Zhao appeals from an adverse judgment in his
breach of contract action against The Hudgens Group, Inc.  After a bench trial,
the court entered judgment favoring The Hudgens Group based, at least in part,
on an accord and satisfaction.  In six issues, Zhao contends that (1) the trial
court erred in awarding attorney’s fees to The Hudgens Group, (2) Zhao
established as a matter of law that The Hudgens Group breached the contract
between the parties, (3) the trial court erred in basing its judgment on The
Hudgens Group’s first accord and satisfaction defense, (4) the trial court
erred in basing its judgment on the second accord and satisfaction defense, (5)
the trial court erred in holding that the original agreement was satisfied and
that Zhao did not suffer damages, and (6) the trial court erred in refusing to
grant a new trial based on, among other things, newly discovered evidence.  We
modify the judgment to eliminate the award of attorney’s fees and affirm the
judgment as so modified.

I.  Background

            On February 3,
2006, Zhao and The Hudgens Group entered into a Memorandum of Agreement (MOA)
concerning an investment in real property in Galveston County (the canal lot). 
Under the terms of the agreement, the canal lot was to be purchased in Zhao’s
name, with Zhao providing over $32,000 of the down payment and The Hudgens
Group providing $10,000.  The canal lot was to be sold within one year from the
date of purchase, with the proceeds split evenly after Zhao’s share of the down
payment was reimbursed.  The parties also agreed to bear evenly any losses. 
The Hudgens Group retained the right to purchase the canal lot for $225,000
within one year from its purchase.  The Hudgens Group was to be responsible for
making the monthly mortgage payments until it purchased or sold the property. 
The canal lot was then purchased in Zhao’s name for $195,000 plus closing costs
of over $4,000, and The Hudgens Group began making the monthly mortgage
payments.

            Before entering
the MOA, The Hudgens Group had entered into an agreement with JZ Investments, a
company partially owned by Zhao, under which The Hudgens Group and JZ invested
in two Galveston “dry lots,” i.e., lots not located on the water.  On
one of these dry lots, Randall Hudgens, a homebuilder and owner of The Hudgens
Group, began constructing a “spec house.”  The Hudgens Group was making
mortgage payments on the spec house property.

            At some point,
The Hudgens Group stopped making the mortgage payments on both the canal lot
and the spec house property.  The spec house property then went into
foreclosure, and Zhao purchased it at the foreclosure sale.  Zhao also began
making the payments on the canal lot, the title to which was already in his
name.  The canal lot was ultimately sold for a loss at $180,000.  Zhao subsequently
sued The Hudgens Group for breach of the MOA.  In the lawsuit, Zhao principally
sought reimbursement for eighteen mortgage payments he made on the canal lot,
totaling approximately $35,000.

            Among its
defenses in the lawsuit, The Hudgens Group asserted two different alleged oral agreements,
each superseding the MOA and resulting in an accord and satisfaction.  In the
first oral agreement, according to The Hudgens Group, Zhao agreed to take over the
monthly loan payments on both the spec house property and the canal lot, and
The Hudgens Group agreed to relinquish any rights it had to those properties,
including any right to reimbursement or profits.  In the second alleged oral agreement,
The Hudgens Group agreed to provide information to aid Zhao in completing the
construction of the spec house and, in return, Zhao agreed to not sue Hudgens
or The Hudgens Group over the canal lot.  The Hudgens Group further alleged
that the terms of the MOA itself had been fulfilled.

            The case was
tried to the bench with Zhao representing himself.  The only two witnesses
called were Zhao and Randall Hudgens.  They both essentially agreed regarding
the formation of their investment relationships, but they markedly disagreed
regarding the latter stages of their relationship and about the existence or
terms of any oral agreements.

Hudgens testified that by the end of 2005 and
beginning of 2006, the spec house was in the final stages of completion.  He
also said that in May 2006, he found a buyer for the canal lot.  Karl Hancock,
a Galveston-area homebuilder, owned a house on an adjacent lot and wanted to
construct a pool on the canal lot.  According to Hudgens, Hancock offered
$215,000 for the canal lot, but Zhao rejected the offer.[1]

            Hudgens acknowledged
that he began to have difficulty making the mortgage payments for both the spec
house property and the canal lot.  He said that he had not expected to have to
carry both notes for a long time but that the Galveston property market had
begun to decline, making sales increasingly difficult.  According to Hudgens,
he asked Zhao to make payments on the canal lot while Hudgens continued making
the spec house property payments.  Around this time, Zhao began urging Hudgens
to transfer the spec house and spec house property note to Zhao, thus
abandoning Hudgens’ investment in that property.  Hudgens said that he had
attempted to get refinancing for the spec house property in order to give JZ
Investments its initial $53,000 down payment back but that Zhao wanted a 40%
return on the property and refused to release the secondary lien owned by JZ
Investments.

Eventually, according to Hudgens, he orally agreed to
let Zhao take over the debt of both properties and ownership of the spec
house.  Hudgens said that at the time, it looked like the nearly completed spec
house was going to make a profit, whereas the canal lot was going to be a
loss.  Hudgens gave Zhao permission to talk to Enterprise Bank, which held the
spec house mortgage, and believed that an understanding had been reached that
would keep the property out of foreclosure.  Hudgens testified that he stopped
making payments on the spec house property because of the first oral agreement.

            Negotiations
between Zhao and Enterprise fell though, however, and the spec house property went
into foreclosure because of the missed mortgage payments.  Hudgens stated that
the negotiations failed because Zhao was demanding a steep discount, which the
bank refused.  Further, according to Hudgens, after Zhao bought the spec house property
at the foreclosure sale, Zhao contacted Hudgens and asked for assistance in
completing the construction of the spec house.  Hudgens asked Zhao why he
should help, given that Zhao had just “put [him] out of the building
business.”  Zhao responded that if Hudgens helped with the spec house, Zhao
would not sue over Hudgens’s failure to make payments on the canal lot
mortgage.  As Hudgens explained, Zhao had no prior experience in the home-building
industry, and Zhao said that all he needed was information.  Hudgens testified
that he orally agreed to help Zhao in return for Zhao’s agreement not to sue
over the canal lot.  Hudgens said that this agreement superseded the MOA.

Hudgens further testified that he fulfilled his
obligations under the second oral agreement by helping in any way he was
asked.  He detailed times when Zhao called or emailed for information regarding
the spec house and Hudgens provided it, including information about permitting,
an appraisal, a survey, flooring, a water heater, and windstorm certification,
as well as information on locating an engineer and a plumber.

            In his testimony,
Zhao acknowledged that after he purchased the spec house property at the
foreclosure sale, certain things still needed to be done to ready the house for
sale.  He further acknowledged turning to Hudgens for help with certain items,
but he denied that there was any agreement regarding such help.  Zhao explained
Hudgens’ willingness to help by pointing out that Hudgens owed certain contractors
for items related to the spec house, such as an appraisal, survey, engineering
and plumbing services; by helping Zhao, Hudgens ensured the contractors would
get paid by Zhao.

Zhao also questioned the value of help and
information provided by Hudgens.  According to Zhao, while Hudgens provided
certain information, such as a permit number, how to get a copy of the
appraisal, who to call for the survey information, that money was still owed on
the flooring, and why the water heater had not been installed, Hudgens was unable
to provide other information, such as the process for getting a windstorm
certificate.  Zhao also testified that Hudgens’ information was not always
accurate, such as the location of the engineer who had inspected the property
and the name of a carpenter who had worked on the spec house.  Zhao further said
that he could have obtained much of Hudgens’ information from the City of
Galveston, and he only asked Hudgens to save time. [2]  According
to Zhao, Hudgens gave him advice regarding deck posts at the spec house that
contradicted information from the engineer who had inspected the property.

Zhao also pointed out that he had requested help from
Hudgens even before buying the spec house on foreclosure.  He suggested that
Hudgens’ subsequent assistance was just a friendly response to a request for
help that pre-dated the alleged oral agreement.  However, the evidence to which
Zhao points to support this contention—a series of emails on March 1 and 2,
2007—actually supports the opposite conclusion, i.e., that Hudgens was
not willing to help.  In the email exchange, Zhao twice requested the name and
phone number of the company that performed an appraisal on the spec house, and
Hudgens twice declined to provide that information.  The exchange can best be described
as “testy.”  The next series of emails admitted into evidence, dating from
March 12 and 14, 2007—apparently after the foreclosure sale and the purported second
oral agreement—reveals Zhao again asking for the appraisal information and
Hudgens agreeing to provide it.

The record also contains numerous subsequent email
exchanges, over a several-month period, in which Zhao requested information
regarding the spec house and Hudgens provided it.  Of particular note are two
emails occurring toward the end of the exchanges.  In one, dated August 8,
2007, Hudgens stated:  “as you know [I] have
given you help on the [spec house] in any way you have asked, ever since you
bought out my project. . . .  [S]ince you agreed not to sue me or my company, I
have been available for you to help in any way possible so you could profit
from the [spec house].”  Zhao acknowledged in his testimony that this
email made it sound like there was an agreement in place “if somebody didn’t
know what happened after that.”

In the other e-mail, dated August 15, 2007, Hudgens
sternly denied a request from Zhao to sign a letter to Enterprise Bank
permitting it to discuss any issues regarding the spec house loan with Zhao. 
At the conclusion of his response, Hudgens stated:  “I have helped you through the punch out with the project, and any way you
have asked, when I have not had any obligation to do so, but you have crossed
the line.”  Zhao suggested during trial that this email language demonstrated
that there was no second oral agreement between the parties relating to help
with the spec house.  Hudgens explained that his statement in the email
indicating that he had no obligation, was a reference to entering into the
second oral agreement (i.e., he had no obligation to agree to help in exchange
for not being sued), not an admission that there was no second oral agreement .

At the conclusion of the trial, the court entered
judgment that Zhao take nothing on his claims against The Hudgens Group and
that The Hudgens Group recover $8,800 in attorney’s fees.  In the judgment, the
court specifically states that it found “in favor of [The Hudgens Group] on the
ground [sic] of the affirmative defenses of accord and satisfaction of
superceding [sic] [oral] contract and that the Memorandum of Agreement was
satisfied.”  After entry of judgment, Zhao sought a new trial based on the
alleged discovery of new evidence.  Zhao’s motion for new trial was overruled
by operation of law.

            As stated above,
on appeal, Zhao asserts that (1) the trial court erred in awarding attorney’s
fees to The Hudgens Group, (2) he established as a matter of law that The
Hudgens Group breached the MOA, (3) the trial court erred in basing its
judgment on The Hudgens Group’s first accord and satisfaction defense, (4) the
trial court erred in basing its judgment on the second accord and satisfaction
defense, (5) the trial court erred in holding that the original agreement was
satisfied, and (6) the trial court erred in refusing to grant a new trial.

II.  Accord and Satisfaction

            In his fourth
issue, Zhao asserts that the trial court erred in basing its judgment on The
Hudgens Group’s second accord and satisfaction defense.  In that affirmative
defense, The Hudgens Group alleged the second oral agreement under which
Hudgens agreed to help Zhao with completing the spec house he bought at
foreclosure, and Zhao agreed to not sue Randall Hudgens or The Hudgens Group on
the canal lot.

Under Texas common law, the affirmative defense of
accord and satisfaction is based on an express or implied contract under which
the parties agree to discharge an existing obligation by means of a lesser
payment that is tendered and accepted.  Lopez v. Munoz, Hockema & Reed,
L.L.P., 22 S.W.3d 857, 863 (Tex. 2000).  To prevail on this defense, The
Hudgens Group had to produce evidence establishing (1) a dispute between the
parties, and (2) that the parties specifically and intentionally agreed to
discharge The Hudgens Group’s prior obligations.  See id.

On appeal, Zhao specifically asserts that as a matter
of law:  (1) the alleged second oral agreement was too vague to be the basis
for a valid accord and satisfaction, (2) The Hudgens Group failed to establish
that it indeed performed its alleged obligations under the second oral
agreement, and (3) the alleged second oral agreement contradicts
contemporaneous documents without explanation.  We will address each issue in
turn.  To the extent Zhao’s arguments require that we review the legal
sufficiency of the evidence, we utilize well-established standards in doing
so.  See City of Keller v. Wilson, 168 S.W.3d 802, 810-21 (Tex.
2005).

A.  Vagueness

As stated, Zhao initially argues that the second
alleged oral agreement was too vague to be an enforceable contract or the basis
for an accord and satisfaction.  An alleged agreement is sufficiently definite
if a court is able to determine the respective legal obligations of the parties
thereunder.  Playoff Corp. v. Blackwell, 300 S.W.3d 451, 455 (Tex.
App.—Fort Worth 2009, pet. denied) (citing T.O. Stanley Boot Co. v. Bank of
El Paso, 847 S.W.2d 218, 221 (Tex. 1992)).  Stated conversely, if an
alleged agreement is so indefinite as to make it impossible to fix the legal
obligations and liabilities of the parties, it cannot constitute an enforceable
contract.  Id. (citing Restatement (Second) of Contracts § 33(2)
(1981)).

The nature of the second oral agreement alleged by
The Hudgens Group was straightforward.  Randall Hudgens testified that Zhao
called him after purchasing the spec house at the foreclosure sale.  According
to Hudgens, during their phone conversation, Zhao requested Hudgens’ help with
the spec house in exchange for Zhao’s agreement not to sue Hudgens or The
Hudgens Group over the canal lot.  Hudgens further stated that Zhao told him
the desired assistance was in the form of information only.

Zhao specifically argues that the alleged second oral
agreement was too vague in that (1) the “boundaries” of Hudgens’ help were not
specifically defined in terms of content, duration and acceptable performance, (2)
no time frame was given for Zhao’s restraint from suing, and (3) no terms were
given regarding the mortgage payments on the canal lot.  As to the “boundaries”
argument, the second oral agreement was not fatally indefinite for not spelling
out the specifics of the help to be given where Zhao appeared to not know
exactly what he was going to need.[3] 
Furthermore, Hudgens testified that he was to help Zhao by providing
information for completion of the spec house through the “punch list” for the
property.  Thus, there was evidence upon which the trial court could conclude
that the duration of Hudgens’ promise to provide information upon request to
Zhao was until the house was completed and ready for sale.  Zhao offers no
authority or argument for his suggestion that the agreement was too vague
because it did not provide a specific basis for measuring Hudgens’
performance.  Certainly, one possible measure of nonperformance would be
Hudgens’ refusal to provide requested information.  The boundaries of performance
in this simple agreement were sufficiently set forth.

Zhao next complains that no timeframe was given for
how long he was to refrain from suing; however, there is no indication in the
record that such a timeframe was necessary.  Hudgens testified that Zhao agreed
not to sue Hudgens or The Hudgens Group over the canal lot.  This testimony
clearly implies that the agreement was that as long as Hudgens performed his
obligation under the agreement, Zhao would never bring such a lawsuit.

Lastly, Zhao points out that the agreement did not
specify who was responsible for continuing to make the mortgage payments on the
canal lot.  Evidence established that, by the time the agreement was allegedly
entered, Hudgens, presumably on behalf of The Hudgens Group, had asked Zhao to
take over payments on the canal lot mortgage and had stopped making such
payments himself.  The trial court could have reasonably concluded that in
agreeing to refrain from suing The Hudgens Group regarding the canal lot, Zhao
was agreeing to release The Hudgens Group from its canal lot obligations.  In
short, the alleged agreement between Zhao and Hudgens did not fail for lack of
specificity.

B.  Performance

Next, Zhao contends that even if the second oral
agreement existed, The Hudgens Group failed to demonstrate that it or Hudgens
performed the obligations under that agreement; thus, according to Zhao, no
satisfaction of the MOA ever occurred.  Zhao’s essential argument here is that
the information provided by Hudgens “was of little use and carried little to no
value.”

As explained above, Hudgens testified that he agreed
to provide Zhao information so that Zhao could complete the spec house. 
Hudgens further testified that he provided all the requested information to the
best of his ability.  There is considerable evidence in the record regarding
what Zhao requested and what Hudgens provided.  The testimony of both men
provided details of the requests and the aid provided, as did the emails
admitted into evidence.

In his brief, Zhao identifies certain items of help
allegedly provided by Hudgens that he claims were ultimately not very helpful. 
However, Zhao’s critique of Hudgens’ assistance does not negate The Hudgens
Group’s evidence of performance.  Below, we discuss the items as identified by
Zhao, as well as Hudgens’ response:

·       
Zhao
requested information about the appraisal company, and Hudgens provided the
name of the company and a phone number.  Zhao points out that his request came
before the alleged agreement was entered, but as explained above, Hudgens
declined to provide the information after two requests and only subsequently
provided it after the alleged agreement was in place.  Thus, the providing of
this information was in performance of the oral agreement. 

 

·       
Zhao
asked for a copy of the spec house survey, and Hudgens told him how to get one
from the surveyor.  Zhao complains that he had to pay for a copy of the survey.
Hudgens apparently did not have a free survey to give Zhao, and the second oral
agreement called only for providing information, not paying for surveys.  This does
not negate performance of the agreement.

 

·       
Zhao
asked for a windstorm certificate, but Hudgens responded that he had little
experience with that and recommended Zhao contact the surveyor, for whom
Hudgens provided a name and phone number.  Hudgens’ “help” in regards to the
certificate was of minimal value, but there is evidence that he tried to find a
solution for Zhao.

 

·       
Zhao
asked for contact information for the engineer on the spec house because he
might have the windstorm certificate.  Hudgens responded that he used an
engineer out of League City but was having trouble locating the engineer’s
phone number.  Zhao states that he later found the engineer himself in
Hitchcock.  On this item, it does appear that Hudgens did not provide the
requested assistance, although the evidence indicates that he tried to do so
and that he informed Zhao of a different way to obtain the windstorm
certificate:  through the surveyor.

 

·       
Zhao
requested contact information for the contractor who built the wood decks at
the spec house, as he believed the decks needed additional bolts in order to be
windstorm certified.  Hudgens replied that the carpenter was a man named Jose
but that he was no longer working on Galveston Island.  He further told Zhao
that the framing had been done properly and had already been inspected and
passed by the engineer.  He recommended that if Zhao still needed work done on
the decks, he could get someone else in Galveston to do it.  Although Zhao did
not get the information he originally requested, Hudgens did provide
information regarding this item.

 

·       
Zhao disputes Hudgens’ contention that the framing
had passed inspection, claiming that the original engineer never inspected the
decks.  However, Zhao only cites his own testimony as evidence of this, and the trial court could have disregarded Zhao’s
testimony and accepted Hudgens’ on this issue.  See City of Keller, 168
S.W.3d at 820.

 

·       
Zhao
requested a permit number for the spec house, and Hudgens provided one.  In his
brief, Zhao suggests that the number was incorrect; however, the citation to
his own testimony does not support this contention.

 

·       
Zhao
asked why a water heater had not been installed at the property.  According to
Zhao, Hudgens simply responded that the plumber had stopped showing up to work
and that Zhao should call another one.  However, the emails revealed that Zhao
also stated that the height of the attic appeared to preclude putting a water
heater there, and he asked Hudgens to “please take a look at the plan to see
what water heater(s) to be used [sic]?”  Hudgens then responded with a
specific model number that could fit the space allowed, explained that all
major manufacturers had models in that size, and told Zhao that a plumber could
buy and install a water heater for him.  Thus, Hudgens provided the requested
information.

 

·       
Finally,
Zhao challenges Hudgens’ assertion in his testimony that he had helped Zhao
regarding a problem with the setback line.  According to Hudgens, there was
actually no such problem.  The email cited by Zhao does not directly refute
this contention, and even if it had, the trial court could have accepted
Hudgens’ explanation.  See id.

 

As the above discussion illustrates, despite Zhao’s
critique of Hudgens’ performance, there was evidence that Hudgens performed
under the alleged second oral agreement.[4] 
Thus, Zhao’s contention to the contrary is without merit.

Zhao further appears to complain that the aid provided
was not worth the over $32,000 that he believed he would be entitled to recover
in a lawsuit against The Hudgens Group.  However, he cites no authority in
support of his contention that this calculation is relevant to the issue of
whether Hudgens performed.  The very nature of an accord and satisfaction is
that the obligee under an agreement agrees to accept less than owed under the
original agreement in return for extinguishing the obligations under that
agreement.  See Lopez, 22 S.W.3d at 863.

Further, viewed from Zhao’s perspective at the time
he allegedly entered the second oral agreement, it was far from clear that he
would be successful in a lawsuit against The Hudgens Group.  Hudgens had made
his own complaints in numerous emails regarding Zhao’s conduct. Thus, the
possibility that the value of Hudgens’ aid may have been worth less than $32,000
to Zhao does not establish as a matter of law that Hudgens did not perform
under the second oral agreement.  We find no merit in Zhao’s performance arguments.

C.  Conflicts in the Evidence

            Lastly under
issue four, Zhao contends that Hudgens’ testimony regarding the second oral
agreement contradicted “contemporaneous documents without any explanation.” 
Specifically, Zhao argues that Hudgens’ testimony contradicted (1) The Hudgens
Group’s answers in the lawsuit, (2) an email Hudgens sent to Zhao in August,
2007, and (3) an email Zhao sent to Hudgens, also in August 2007.  Generally,
conflicts in the evidence are matters for the fact-finder to resolve.  City
of Keller, 168 S.W.3d at 820.  We assume the fact-finder in this case
resolved any conflicts in The Hudgens Group’s favor.  See id.

The answers The Hudgens Group filed in the lawsuit
were not evidence at trial.  Cf. Laidlaw Waste Sys. (Dallas), Inc. v. City
of Wilmer, 904 S.W.2d 656, 660 (Tex. 1995) (“Generally, pleadings are not
competent evidence, even if sworn or verified.”).  Zhao has offered no legal
argument or authority to support his contention that any discrepancy between
Hudgens’ testimony and the pleadings nullifies the judgment in this case.  See
Tex. R. App. P. 38.1(i) (“[Appellant’s] brief must contain a clear and concise
argument for the contentions made, with appropriate citations to authorities
and to the record.”).  Consequently, we find no merit in this argument.

Next, Zhao cites an email Hudgens sent on August 15,
2007, in which Hudgens stated:  “I have helped
you through the punch out with the project, and in any way you have asked when I have not had
any obligation to do so but you have crossed the line.”  Zhao asserts that this
email excerpt demonstrates that there was no agreement between the parties
relating to help with the spec house.  The email was sent in response to a
request from Zhao asking Hudgens to sign a letter permitting Enterprise Bank to
make an accounting of the spec house loan and discuss the loan with Zhao.  In
the email, Hudgens suggested Zhao had gone too far and might be seeking
something illegal.  At the email’s conclusion, Hudgens made the above quoted statement.

In his trial testimony, Hudgens explained that his statement in the email that he was not
obligated to agree to help was not an admission that there was no second oral agreement. 
Additionally, an earlier email from Hudgens explicitly referenced that he was
helping Zhao with the spec house because Zhao had agreed not to sue The Hudgens
Group.  Given the context of the emails and Hudgens’ testimonial explanation,
it was within the trial court’s discretion as fact-finder to reject Zhao’s
contention that Hudgens’ August email constituted an admission that no
agreement had been reached and that Hudgens had merely provided help as a
friend.  See City of Keller, 168 S.W.3d at 820. 
Accordingly, we find no merit in Zhao’s argument.

Lastly, Zhao argues that his own statements in emails
sent in August 2007 conflict with Hudgens’ trial testimony and demonstrate that
there was no second oral agreement.  Specifically, Zhao references an email in
which he told Hudgens:  “I am very glad to learn that you have 20 years of
track record of total trust worth and solid reputation. That means I can trust you
to make mortgage payments on the canal lot as you promised me.”  Zhao’s email
came in the midst of a heated exchange with Hudgens, in fact, the very one in
which Hudgens accused Zhao of having gone too far in his requests for help. 
Given the combative context of this exchange and the self-serving nature of
Zhao’s statement, the trial court was within its discretion as fact-finder to
reject Zhao’s suggestion that his email proved that there was no agreement to
extinguish The Hudgens Group’s debt related to the canal lot.  Finding
no merit in any of Zhao’s arguments under his fourth issue, we overrule Zhao’s
fourth issue.[5]

III. Motion for New Trial

In his sixth issue, Zhao contends that the trial
court erred in refusing to grant a new trial based on (1) several pieces of
evidence discovered subsequent to trial, and (2) the same arguments discussed
above regarding the accord and satisfaction defense.  We will discuss each
ground in turn.

A.  Newly Discovered Evidence

A party seeking a new trial on grounds of newly discovered
evidence must demonstrate that:  (1) the evidence has come to his or her knowledge
since the trial, (2) the failure to discover the evidence sooner was not due to
a lack of diligence, (3) the evidence is not cumulative, and (4) the evidence
is so material it would probably produce a different result if a new trial were
granted.  Waffle House, Inc. v. Williams, 313 S.W.3d 796, 813 (Tex.
2010).  It is also sometimes said that such evidence cannot be merely for the
purpose of impeaching the testimony of the opposing party.  See New
Amsterdam Cas. Co. v. Jordan, 359 S.W.2d 864, 866 (Tex. 1962); Fantasy
Ranch, Inc. v. City of Arlington, 193 S.W.3d 605, 615 (Tex. App.—Fort Worth
2006, pet. denied); Hughes Drilling Fluids, Inc., Div. of Hughes Tool Co. v.
Eubanks, 729 S.W.2d 759, 763 (Tex. App.—Houston [14th Dist.] 1986), writ
granted w.r.m., 742 S.W.2d 275 (Tex. 1987).  We review a trial court’s denial
of a motion for new trial for an abuse of discretion.   Waffle House,
313 S.W.3d at 813.

In his motion for new trial, Zhao alleged that after
the trial concluded, he made three discoveries warranting a new trial:  (1)
that Karl Hancock denies that he ever offered to buy the canal lot as Hudgens
testified at trial, (2) that the final inspections on the spec house were not
completed prior to foreclosure as Hudgens indicated at trial, and (3) that The
Hudgens Group maintained a website in 2009 for the purpose of selling homes
constructed by Hudgens.  Zhao attached to his motion an affidavit from Hancock,
a Certificate of Occupancy from the City of Galveston, and two screen shots
from The Hudgens Group’s alleged website.

The trial court, however, did not abuse its
discretion in declining to grant a new trial on any of these new-evidence
grounds because Zhao failed to demonstrate to the trial court that the failure
to discover the evidence sooner was not due to a lack of diligence.  See id. 
With regard to the latter two items of allegedly newly discovered evidence—concerning
inspections of the spec house and the alleged website—Zhao made absolutely no
effort to demonstrate that the failure to discover the evidence sooner was not
due to a lack of diligence.

Regarding the first listed item—that pertaining to
Hancock’s apparent disclaimer of making any offer to buy the canal lot—we note
that Zhao stated in his motion that Hudgens did not reveal the name of the
purportedly interested buyer prior to trial.  But Zhao does not argue that he
could not have discovered the name earlier.  In fact, all of the evidence Zhao
claims to have discovered post-trial appears to be of types that could have
been discovered through the effective use of standard pretrial discovery
techniques.  In the absence of a showing that the failure to discover the
evidence sooner was not due to a lack of diligence, we cannot say the trial
court abused its discretion in refusing to grant a new trial.  See id.

B.  Great Weight and Preponderance

            In his final
ground for new trial, Zhao contends that the trial court’s final judgment is
against the great weight and preponderance of the evidence.  Although Zhao does
not offer any citations to authority or provide cogent legal or factual
argument in this section of his brief, we take his position to be that the
evidence was factually insufficient to support the judgment.  See generally Tex.
R. App. P. 38.1(i) (stating an appellant’s brief must contain clear argument
for the contentions made, as well as appropriate citation to authority); Dow
Chem. v. Francis, 46 S.W.3d 237, 241-42 (Tex. 2001) (discussing standards
governing factual sufficiency review).

Regarding the second oral agreement, which the trial
court found operated as an accord and satisfaction of the MOA, Zhao at best
merely attempts to incorporate by reference the same arguments discussed above
under issue four.  For the same reasons we rejected these arguments above, we
reject them here as bases for a new trial under the standards governing factual
sufficiency of the evidence.  See Manon v. Solis, 142 S.W.3d 380, 390-91
(Tex. App.—Houston [14th Dist.] 2004, pet. denied) (overruling appellant’s factual
sufficiency issue which merely incorporated by reference same arguments raised
in legal sufficiency issue, holding issue was improperly briefed and otherwise
without merit).  Finding no merit in any of Zhao’s new trial arguments, we
overrule Zhao’s sixth issue.

IV.  Attorney’s Fees

            In his first
issue, Zhao contends that the trial court erred in awarding attorney’s fees to
The Hudgens Group.  In its live petition at the time of trial, The Hudgens
Group asserted only section 38.001 of the Civil Practice and Remedies Code as
the basis for its request for attorney’s fees.  The petition contained no counter-claims,
causes of action, or requests for affirmative relief other than the request for
attorney’s fees under section 38.001.

Section 38.001 authorizes recovery of attorney’s fees
when a party proves a valid claim based on a written or oral contract.  Tex.
Civ. Prac. & Rem. Code § 38.001.  However, it does not authorize an award
of attorney’s fees for successfully defending against a breach of contract
claim.  E.g., Thottumkal v. McDougal, 251 S.W.3d 715, 718-19
(Tex. App.—Houston [14th Dist.] 2008, pet. denied) (citing Am. Airlines,
Inc. v. Swest, Inc., 707 S.W.2d 545, 547 (Tex. 1986)).  Although The
Hudgens Group successfully defended against Zhao’s breach of contract claim, it
did not affirmatively raise or prove that Zhao breached the contract.  Consequently,
the trial court erred in awarding attorney’s fees to The Hudgens Group based on
section 38.001.  We sustain Zhao’s first issue.

V. 
Conclusion

Having sustained Zhao’s first issue, we modify the
judgment to remove the award of attorney’s fees.  Having overruled the
remainder of Zhao’s issues, we affirm the judgment as modified.

 








                                                                                    

                                                                        /s/        Martha
Hill Jamison

                                                                                    Justice

 

 

 

Panel consists of Justices Brown, Boyce,
and Jamison.

 









[1]
Zhao testified that although there was apparently a buyer interested in the
spec house at one point, Hudgens did not reveal it was Hancock until his
testimony at trial.





[2]
In his testimony, Hudgens explained that he provided the correct name of the
carpenter but that the carpenter may have moved.  He further denied that Zhao
could have obtained from the city all of the answers he sought.  He also stated
that it was “ridiculous” to suggest he would have helped Zhao merely because
Zhao paid off a few subcontractors for work done on the spec house; Hudgens
explained that the subcontractors in question were longtime associates who had
not demanded payment from him.  An email admitted into evidence revealed
Hudgens told Zhao he had no recent experience with windstorm certificates and
recommended that Zhao talk to a specified surveyor for help.





[3]
Section 34 of the Restatement (Second) of Contracts explains that “[t]he terms
of a contract may be reasonably certain even though it empowers one or both
parties to make a selection of terms in the course of performance.”  Restatement
(Second) of Contracts § 34(1).  Comment “a” to that section further states that
an agreement “is not made invalid by the fact that it leaves particulars of
performance to be specified by one of the parties.”  Id. § 34 cmt. a. 
Furthermore, even when one or more terms are missing from an alleged agreement,
the parties may show by their subsequent actions that they intended to conclude
a binding agreement.  See id. § 33 cmt. a.  Here, after the alleged
agreement was entered, Zhao made numerous requests for help from Hudgens and
Hudgens provided information to Zhao.





[4]
It is also worth noting what the record does not contain:  significant
evidence that Zhao was displeased with the information Hudgens was providing at
the time it was provided.  Based on Hudgens’ testimony and the email exchanges,
the trial court could have concluded that Zhao found Hudgens’ performance
acceptable, at least until Hudgens’ refusal to sign the letter request to
Enterprise Bank.





[5]
Because the trial court’s judgment was supported by its finding of accord and
satisfaction based on the second alleged verbal agreement having superseded the
MOA, we need not consider the merits of Zhao’s third and fifth issues, which
challenge other bases for the court’s judgment.  Further, we need not address
Zhao’s contention in issue two that he proved as a matter of law that The
Hudgens Group failed to comply with the MOA.  By definition, such argument does
not defeat an accord and satisfaction affirmative defense.  See Lopez,
22 S.W.3d at 863.  We therefore overrule Zhao’s second, third, and fifth issues
as moot.