

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-12-00150-CV

THOS. S. BYRNE, LTD.                                  APPELLANT

V.

SEAL CRAFT CORPORATION                        APPELLEES
AND THE GRAY INSURANCE
COMPANY

----------

### FROM THE 17TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. INTRODUCTION

Appellant Thos. S. Byrne, Ltd. appeals from a take-nothing judgment entered in accordance with a jury verdict finding that Appellee Seal Craft Corporation did not breach its subcontract with Byrne and that Appellee The Gray Insurance Company did not fail to comply with a performance bond issued

---

[1]*See* Tex. R. App. P. 47.4.

in connection with Seal Craft's subcontract. In five issues, Byrne argues that the trial court erred by denying its motion for judgment notwithstanding the verdict (JNOV) and motion to disregard a jury finding and, alternatively, that the evidence is factually insufficient to support the jury's liability findings. We will affirm.

## II. BACKGROUND

Byrne is a general contractor located in Fort Worth that specializes in large commercial construction projects. Seal Craft, based in Shreveport, Louisiana, designs and manufactures specialty window products for commercial applications.

On December 1, 2004, Kimco Montgomery Plaza, LP entered into a general contract with Byrne to selectively demolish and renovate the exterior "skin," including the windows, of the Montgomery Ward building (Montgomery Plaza), an eight-story, steel-reinforced concrete structure built in 1929 measuring about a block-and-a-half wide and between two and two-and-a-half blocks long. Byrne also entered into a "STANDARD SUBCONTRACT AGREEMENT" with Seal Craft dated November 17, 2004, whereby Seal Craft agreed to fabricate and install new windows in the building.[2] Under the subcontract, Seal Craft was responsible for manufacturing and installing 1,430 windows for 585 openings (each opening typically contained three windows and a Fulton ventilator

---

[2]The building's preexisting windows had been removed by another contractor. Byrne was responsible for finishing the concrete openings before Seal Craft installed the new windows.

2

positioned in the middle window).[3] Seal Craft warranted that "all Subcontract Work shall be performed in a good and workmanlike manner and shall be free from any and all defects due to faulty workmanship and/or materials and shall comply with all requirements of the Contract Documents." Byrne obtained a performance bond that identified Seal Craft as the principal and Gray as the surety.

Seal Craft prepared shop drawings based on criteria established by the project architect, Hodges and Associates, P.L.L.C., and produced a product submittal that contained detailed information about the windows, both of which Byrne and Hodges approved. Seal Craft later manufactured and installed a mock-up window. Architectural Testing, Inc. (ATI) tested the mock-up in late November and early December 2004. The initial testing revealed several glazing leaks that Seal Craft attributed to either uncured sealant or to an issue involving the assembly of the Fulton ventilator.[4] Seal Craft repaired the leaks, and subsequent testing revealed no water leakage. At this point, according to

---

[3]Many of the window openings measured approximately sixteen-feet wide and between six- and eleven-feet tall. Charles Still, a fenestration specialist hired by Seal Craft, described the fixed light aluminum windows as "huge" and explained that they contained over 5,000 lights of glass and enough sealant to measure twenty-nine miles long.

[4]Byrne describes a glazing leak as "a leak occurring at the glass pane and the frame where a seal may be damaged/broken." Ray VanNess, Seal Craft's president and sole owner, explained to Byrne that glazing leaks could occur when installing the windows due to their size and the difficulty associated with moving and installing them. Seal Craft assured Byrne that it would repair the glazing leaks as they manifested themselves, and Byrne confirmed that Seal Craft did so throughout the window installation process.

VanNess, he had "effectively communicated to the architect and to [Byrne] . . . what [he] was intending to provide and install," and the approval of the mock-up gave him "the confidence to start spending bunches of money manufacturing these windows and starting to get them installed," which Seal Craft proceeded to do in January 2005. Byrne simultaneously maintained a field installation record for purposes of quality control.

In May 2005, after Seal Craft had installed about 40% of the windows, ATI performed an on-site water test of three windows. ATI reported that the first window had no leaks and that the second and third windows had a glazing leak around the area of the lock near the Fulton ventilator.[5] Seal Craft backfilled sealant around the glazing joints, and neither the second nor the third window leaked after it was retested.

ATI conducted a follow-up test of several windows in July 2005 because of a concern that the moisture detected after the first test in May 2005 had penetrated through the window system. The tests instead revealed a few glazing leaks, which Seal Craft repaired.

In August 2005, ATI conducted another window test, but unlike the previous tests, it took place in a controlled laboratory environment. The window passed.

---

[5]ATI observed some moisture seeping under the windowsill during the testing of the first window, but it could not determine whether the moisture was caused by Seal Craft's window installation or by problems with the masonry opening.

Seal Craft continued installing windows during the summer 2005 tests—in fact, it was instructed to hurry up—and completed installing the remaining windows and demobilized from the job site in November 2005.

Between November 2005 and January 2006, Seal Craft submitted an application for payment and various closeout documents to Byrne, including a one-year limited products warranty and remedy that commenced on December 15, 2005, and Gray's consent for final payment to Seal Craft. Byrne paid Seal Craft the remaining amount owed under the subcontract, less a retainage in the amount of approximately $133,000. Hodges executed a certificate of substantial completion dated February 1, 2006, for the project the subject of the December 1, 2004 contract between Byrne and Kimco. That same day also marked the beginning of Byrne's one-year warranty to Kimco for the work performed on the project, excluding those items included on the punch lists attached to the certificate of substantial completion. The punch lists did not include any window leaks.

Sometime soon after January 2006, Byrne noticed moisture inside the building after a subcontractor cleaned the exterior using a "fire hose technique." Byrne notified Seal Craft, who offered to return to the site and begin troubleshooting the window systems for potential leaks, but Byrne advised Seal Craft to postpone doing so until it received a report from Curtain Wall Designs & Consulting, Inc. (CDC), a firm Byrne hired to investigate the moisture infiltration issue.

5

CDC initially reported that "[v]ery few leaks [were] being reported on the window frames themselves." And although it noted some deficiencies, CDC concluded that "[n]o one specific source of the leaks [could] be determined at [that] time."

CDC later reported that there were several defects in the window installation and recommended two remedial options: (1) removing, modifying, and reinstalling all of the windows (CDC's preferred option) or (2) wet sealing all of the windows.[6] Seal Craft, with Byrne's approval, chose to implement CDC's second option.[7] Seal Craft took five months and spent approximately $60,000 to wet seal each window. Byrne spot-tested 4% of the windows and discovered several glazing leaks, which Seal Craft repaired. During the process, Seal Craft clarified for Byrne that it was performing warranty work. Both Byrne and Seal Craft left the job site in August 2006.[8] In May 2007, Byrne paid Seal Craft the remainder of its retainage, $40,250.50, and Byrne received the final payment under its contract with Kimco.

---

[6]VanNess opined that performing option number one would have cost approximately $1.5 million and taken over two years to complete. Regarding the second option, CDC noted in one of its reports that "[w]et sealing the windows appear[ed] to be successful based on the testing done to date."

[7]VanNess described the process as follows: "We got on the boom lift and went to the exterior of the entire building, every single window, and applied an additional caulk seal . . . all the way around."

[8]Byrne claimed to have incurred $113,790—$93,052 attributable to Seal Craft and the remainder to Ray Noteboom Paint Co., the subcontractor responsible for installing a Thorocoat Exterior Coating System on the building— during the "inspection and testing process that occurred from March until August [2006]." It debited the $93,052 from Seal Craft's retainage.

6

Over a year after Byrne and Seal Craft left the job site, in October 2007, Byrne entered into a general contract with OMP Development, LLC, the new owner of Montgomery Plaza, to build out 240 condominiums in the building's east and west towers and a parking garage. Other than its delivery of five additional windows at Byrne's request,[9] Seal Craft did not contract with Byrne to perform any work related to Byrne's 2007 contract with OMP to finish out the interior of Montgomery Plaza. With the exception of the ground level, where retail was operating, the remainder of Montgomery Plaza (where Seal Craft had installed the windows) had sat empty for over a year—between August 2006 and October 2007.

In early 2008, about six months after Byrne had contracted with OMP, Byrne employees discovered approximately eighty leaks at windows while walking through Montgomery Plaza during and after rain events. By letter dated April 8, 2008, Byrne (1) notified Seal Craft about the leaks, (2) required that Seal Craft honor its warranty by performing the first option that CDC had recommended two years earlier (removal and reinstallation of all windows), and (3) demanded that Seal Craft complete CDC's first option by September 30, 2008, about five-and-a-half months later. Thereafter, VanNess met with Byrne to review its reports and to explain his proposed solution for fixing the leaks, and VanNess hired ATI to perform testing on some windows. ATI's tests revealed several window leaks and other leaks associated with cracks in the concrete wall.

_____

[9]This set of windows does not form any part of the underlying lawsuit.

7

Seal Craft offered to address the window leaks one by one, but it refused to perform CDC's first option, concluding that it was unreasonable.[10]

In a July 14, 2008 email, Seal Craft sought guidance from Byrne about how to proceed, but about a week later, Byrne notified Gray that Seal Craft had "breached its subcontract agreement" and demanded that Gray perform and complete CDC's 2006 first option by September 30, 2008, about sixty days later. Gray inspected the site and denied Byrne's claim on August 18, 2008.

In late September 2008, Seal Craft's attorney notified Byrne that the "vast majority of the present existing leaks [were] glazing leaks" and that "Byrne's unrealistic demand to remove all windows and repair internal sill seals [would] not address or resolve the glazing leak issue." Seal Craft's attorney notified Byrne at a later date that Seal Craft was prepared to fix the glazing leaks.

Meanwhile, on September 30, 2008, Byrne received a proposal from DGB Glass, Inc. to perform remedial work on Montgomery Plaza's windows. Byrne entered into a subcontract with DGB on October 9, 2008. DGB performed the subcontract work at a cost of $50,500; it did not remove and reinstall all of the windows.[11]

On or about October 23, 2008, Byrne sued Seal Craft for breach of the 2004 subcontract agreement and Gray for breach of the performance bond. A

---

[10]Seal Craft had also previously scaled back its operations and was only manufacturing—and no longer installing—windows.

[11]Byrne contends that there are additional windows that leak.

8

jury answered "No" to Byrne's breach of contract claim against Seal Craft and "No" to Byrne's breach of the performance bond claim against and Gray but answered "Yes" to a question asking whether Byrne had made an excessive pre-suit demand upon Seal Craft.[12]  Byrne filed a motion to disregard jury answers and for judgment notwithstanding the verdict, which the trial court denied.  Byrne also filed a motion for new trial, which was overruled by operation of law.  The trial court entered a take-nothing judgment in favor of Seal Craft and Gray. Byrne appeals.

### III. MOTION TO DISREGARD AND MOTION TO ENTER JNOV— JURY QUESTION NUMBERS 1, 4, AND 6 AND DAMAGES

All but one of Byrne's issues stem from the trial court's ruling denying Byrne's motion to disregard and motion for JNOV.  Specifically, in its first and second issues, Byrne argues that the trial court erred by denying its motion to disregard the jury's "No" answers to question numbers 1 and 4 and motion for JNOV that Byrne recover judgment against both Seal Craft and Gray.  In its third issue, Byrne argues that the trial court should have rendered a JNOV in its favor for damages because it conclusively proved the amount of damages relevant to Seal Craft's contractual obligation and Gray's bond obligation.  Finally, in its fifth

_____

[12]Jury question number 1 asked, "Did Seal Craft fail to comply with the November 17, 2004 subcontract with Byrne?"  Jury question number 4 asked, "Did Gray fail to comply with its Performance Bond?"  Jury question number 6 asked, "Did Byrne make an excessive pre-suit demand on Seal Craft to remove and reinstall the exterior windows at Montgomery Plaza."

9

issue, Byrne argues that the trial court erred by refusing to disregard the jury's "Yes" answer to question number 6.

### A.    Standard of Review

A trial court may disregard a jury verdict and render judgment notwithstanding the verdict if no evidence supports the jury finding on an issue necessary to liability or if a directed verdict would have been proper.  *See* Tex. R. Civ. P. 301; *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003); *Fort Bend Cnty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex. 1991).  A directed verdict is proper only under limited circumstances:  (1) when the evidence conclusively establishes the right of the movant to judgment or negates the right of the opponent or (2) when the evidence is insufficient to raise a material fact issue. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *Playoff Corp. v. Blackwell*, 300 S.W.3d 451, 454 (Tex. App.—Fort Worth 2009, pet. denied) (op. on reh'g).

To determine whether the trial court erred by denying a JNOV, we view the evidence in the light most favorable to the verdict under the well-settled standards that govern legal sufficiency review.  *See Ingram v. Deere*, 288 S.W.3d 886, 893 (Tex. 2009); *Wal-Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex. 2003).  We must credit evidence favoring the jury verdict if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *See Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009); *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007).  If a

party is attacking an adverse finding on an issue on which the party had the burden of proof, and there is no evidence to support the finding, we then review all the evidence to determine whether the contrary proposition is established as a matter of law. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989).

## B. Jury Question Number 1—Seal Craft's Contractual Liability

Byrne points out that it alleged two separate legal theories against Seal Craft to support its claim for breach of the subcontract: (1) breach of article 7.02 and (2) breach of article 6.02. Article 7.02 contains Seal Craft's warranty to perform the subcontract work in a good and workmanlike manner.[13] Byrne asserts no contention within its sufficiency argument implicating article 7.02 of the subcontract; it has consequently abandoned that legal theory of recovery.

Byrne instead relies solely upon article 6.02(a), contained within the part of the subcontract titled "Indemnification," which states as follows:

> (a) THE SUBCONTRACTOR AGREES TO DEFEND, INDEMNIFY AND HOLD HARMLESS THE CONTRACTOR, THE OWNER, AND ALL OF THEIR AGENTS AND EMPLOYEES (THE INDEMNIFIED PARTIES) FROM AND AGAINST ALL CLAIMS, DAMAGES, LOSSES AND EXPENSES, INCLUDING BUT NOT LIMITED TO (i) ATTORNEYS' FEES, (ii) BODILY INJURY, SICKNESS, DISEASE OR DEATH TO ANY PERSON OR EMPLOYEE, OR (iii) ANY INJURY TO PROPERTY, ARISING OUT OF, RELATED TO, OR CONNECTED WITH, THE PERFORMANCE, OR FAILURE IN PERFORMANCE, OF THE

---

[13]Article 7.02 provides that Seal Craft "warrants to [Kimco] and [Byrne] that all Subcontract Work shall be performed in a good and workmanlike manner and shall be free from any and all defects due to faulty workmanship and/or materials and shall comply with all requirements of the Contract Documents."

11

SUBCONTRACT WORK UNDER THIS AGREEMENT, EVEN IF SUCH CLAIM, DAMAGE, LOSS OR EXPENSE IS CAUSED IN WHOLE OR IN PART BY A NEGLIGENT ACT OR OMISSION BY AN INDEMNIFIED PARTY. THE EXPRESSED INTENTION OF THE PARTIES IS THAT THE SUBCONTRACTOR'S INDEMNITY HEREIN WILL SURVIVE THE TERMINATION OF THIS AGREEMENT AND WILL INDEMNIFY AND PROTECT THE INDEMNIFIED PARTIES FROM THE CONSEQUENCES OF THEIR OWN NEGLIGENCE.

Byrne argues that there is no evidence to support the jury's finding that Seal Craft did not fail to comply with its indemnity obligation because Appellees "presented no evidence at trial regarding Seal Craft's indemnity obligation (or breach thereof) under paragraph 6.02 of the Subcontract. None of the three witnesses presented by Defendants were asked about (or testified about) Seal Craft's indemnity obligation under ¶ 6.02(a) of the Subcontract." Byrne then argues, as it must to prevail, that not only is there no evidence to support the jury's "No" answer, but that it conclusively established each element of its "breach of contract/indemnity agreement cause of action" against Seal Craft. The first prong of Byrne's argument is unpersuasive; we therefore need not reach the second prong. *See Dow Chem. Co.*, 46 S.W.3d at 241 (reasoning that appellate court reviews all the evidence to determine whether the contrary proposition is established as a matter of law only if there is no evidence to support the challenged finding).

Byrne had the burden to prove that Seal Craft breached its indemnity obligation, and our initial task of reviewing the record for evidence that supports the jury's finding that Seal Craft did not fail to comply with that obligation is not

12

limited to evidence involving Seal Craft's specific questioning of one or more of its witnesses about the indemnity obligation. As we explain, the jury could have based its finding that Seal Craft did not fail to comply with its obligation to indemnify Byrne for all losses and expenses arising out of, related to, or connected with Seal Craft's performance under the subcontract on evidence that when Byrne demanded in April 2008 that Seal Craft honor its warranty and perform CDC's first option, Seal Craft no longer bore any contractual obligation, including that of indemnity, to Byrne.[14]

The evidence demonstrates that in November 2004, Byrne and Seal Craft entered into the subcontract for Seal Craft to manufacture and install the windows at Montgomery Plaza. Seal Craft began installing the windows in January 2005 and completed installing them in November of the same year. Testing during the installation process revealed several leaks, but Seal Craft repaired them. Charles Still, Seal Craft's fenestration specialist, testified that Seal Craft's windows were built and installed according to the plans approved by both Byrne and Hodges, the architect.

Seal Craft demobilized from the job site in November 2005 and submitted an application for payment and closeout documents to Byrne, including a one-year warranty that commenced on December 15, 2005. VanNess testified that the application for payment showed "that we're complete, and the only thing that

_____

[14]We therefore need not address Seal Craft's alternative argument that the subcontract does not permit inter-party indemnity.

13

we're owed is a retainage." He also confirmed that Byrne never rejected the one-year warranty. Byrne paid Seal Craft the remainder of its subcontract balance but withheld the retainage.

As for Byrne's contract with Kimco, which was incorporated into the terms of Byrne's subcontract with Seal Craft, Hodges executed a certificate of substantial completion dated February 1, 2006. When asked about the significance of an owner or architect certifying that a project is substantially complete, Still explained, "[I]t means that just a small remaining punch list may be needing attention, but the architect and owner realize that the basic construction is there, and they approve it, and they sign off on it." Byrne's one-year warranty to Kimco for the work performed under their general contract, excluding those items included on the punch lists attached to the certificate of substantial completion, which did not include any window leaks, began on February 1, 2006. VanNess testified that he did not receive a punch list from Byrne.

In late January or early February 2006, Byrne noticed moisture in Montgomery Plaza and hired CDC to investigate. In line with CDC's second remedial option, Seal Craft wet-sealed every window at Montgomery Plaza over the course of five months. Seal Craft unambiguously notified Byrne that it was performing warranty work. Byrne spot-tested a percentage of the windows and discovered several glazing leaks, which Seal Craft repaired, and Byrne and Seal Craft left the job site in August 2006. According to VanNess, Montgomery Plaza

14

was weathertight when Seal Craft and Byrne left in August 2006. Indeed, VanNess testified that at a closeout meeting held on August 16, 2006, "[w]e all congratulated ourselves for doing what was necessary to dry the building in." Seal Craft issued another warranty, this one a three-year warranty, effective as of August 11, 2006, but Byrne's project manager Scott Salyer explained that Byrne never accepted that warranty and that it was provided by Seal Craft to Kimco and Hodges.

The one-year warranty that Seal Craft issued to Byrne expired on December 14, 2006, and Byrne's one-year warranty under its general contract with Kimco expired on January 31, 2007. In May 2007, Byrne paid Seal Craft the remainder of its retainage and Byrne received the final payment under its contract with Kimco.

For over a year, between August 2006 and October 2007, Montgomery Plaza sat empty. It was not until sometime around October 2007, when Byrne secured a contract with OMP, that Byrne returned to the site to begin work under that different contract. In fact, Salyer agreed that upon completion of Byrne's contract with Kimco, Byrne had no idea whether it would be awarded the contract to finish out the interior of Montgomery Plaza. He also testified,

> Q. So in this contract [Byrne's contract with OMP], it's a different owner from -- from the exterior contract, correct?
>
> A. That is correct.
>
> Q. There's a different architect from the exterior contract?
>
> A. That is correct

15

Q.   There is a different contract from the exterior contract?

A.   That is correct.

Q.   There are different plans, and there are different specifications?

A.   Yes, sir, there are different contract documents.

Byrne contends that Seal Craft could not have completed its obligations under the subcontract because Seal Craft's work was required to be "free from any and all defects due to faulty workmanship and/or materials," and the evidence is undisputed that Byrne found leaks in the windows after it began working on the OMP contract. Byrne also directs us to the part of the subcontract which provides that Seal Craft's acceptance of final payment "SHALL IN NO WAY RELIEVE THE SUBCONTRACTOR OF LIABILITY FOR THE OBLIGATIONS FOR REPLACING FAULTY OR DEFECTIVE WORK APPEARING AFTER FINAL PAYMENT." Byrne's argument disregards evidence favorable to the jury's verdict.

As alluded to above, the majority of the window assemblies installed by Seal Craft were rather large, and it took between three and four men to install them. VanNess suspected that twisting and torqueing that occurred during the transportation and installation of the large windows "played a big role in damaging [the] internal glazing seals." However, VanNess warned Byrne "several times" at meetings that they could expect to have some glazing leaks

16

and that he would address them when they manifested themselves, which he did every time.

Still opined that there was nothing unusual about the fact that some of the windows experienced glazing leaks. He described the issue as "common" and recalled that in his experience, "[m]ost of the complaints that we received after windows were built, and shipped, and installed [involved] glazing leaks. The fragile nature of the frames to the glass can often break." Still testified that the existence of glazing leaks does not mean that the windows were defectively designed, and he ultimately concluded that Seal Craft fully performed its scope of work under the subcontract and that all such work met the standards of performance set out in the subcontract.

The jury also heard evidence that after Seal Craft had installed the windows, a subcontractor hired by Byrne cleaned the exterior of Montgomery Plaza using a "fire hose technique." Byrne disputed that the subcontractor pressure-washed the building but acknowledged that the hose "was similar to a small fire hose, but it was greater than a garden hose." VanNess testified that he "would have had a real problem" if the windows were washed with a fire hose because "[t]hat's just too much pressure to put against a window, it might damage it." The jury could have reasonably inferred from this evidence that the leaks of which Byrne later complained were not caused by Seal Craft's manufacture and installation of the windows.

17

Therefore, in light of this evidence, and contrary to Byrne's argument, the mere existence of glazing leaks in 2008 did not, in and of itself, foreclose the jury from concluding that Seal Craft had completed its obligations under the subcontract long before Byrne demanded performance in April 2008.

Byrne also argues that Seal Craft, through VanNess, "continued to recognize its ongoing duty under the Subcontract to provide a non-defective 'weather-tight' product." It points to the following testimony in which VanNess explained his desire to repair the glazing leaks discovered by Byrne in 2008: "I felt like I owed -- I still felt a duty to provide a dry building for [Byrne]. I wanted to. It was a job I'm very proud of. I wanted to see it all the way through to the end, and I wanted to address the individual leaks." But as Seal Craft points out, this is evidence, if anything, of a personal obligation that VanNess felt he owed to Byrne, not a legal obligation.

Byrne alternatively contends that Seal Craft extended its initial one-year warranty to a three-year warranty and that it had a continuing obligation to Byrne in that respect, but as mentioned already, Salyer confirmed that Seal Craft issued the three-year warranty for the benefit of Kimco and Hodges, not Byrne.

Accordingly, the evidence viewed in the light most favorable to the verdict shows that Seal Craft no longer had a contractual duty to indemnify Byrne when Byrne demanded in April 2008 that Seal Craft perform CDC's first option; Seal Craft had fulfilled and completed its contractual obligation to manufacture and install the windows at Montgomery Plaza over two years earlier, and the one-

18

year warranty that Byrne issued to Kimco had expired over a year earlier. Because this evidence supports the jury's finding that Seal Craft did not fail to comply with the November 17, 2004 subcontract with Byrne, the trial court did not err by denying Byrne's motion to disregard jury question number 1 and motion for JNOV that Byrne recover judgment against Seal Craft. We overrule Byrne's second issue.

### C.     Jury Question Number 4—Gray's Performance Bond Liability

In its first issue, Byrne directs us to a part of the performance bond which provides that "in the event of a breach of the Subcontract on the part of the Principal [Seal Craft] (*as determined in the sole discretion of the Contractor* [Byrne]), the Surety [Gray] will" complete the subcontract work or reimburse Byrne for the work that Byrne performed to complete the subcontract. [Emphasis added.] Byrne argues that there is no evidence to support the jury's finding that Gray did not fail to comply with its performance bond and that the evidence conclusively established that Gray breached the performance bond because, relying on the above language from the performance bond, Byrne determined, in its sole discretion, that Seal Craft breached the subcontract and Gray denied Byrne's claim under the bond. Like the previous issue, the evidence supports the jury's "No" answer.

The liability of the surety and the intent of the parties are generally determined by the language of the bond. *Geters v. Eagle Ins. Co.*, 834 S.W.2d 49, 50 (Tex. 1992). Surety agreements are strictly construed, and sureties are

bound only by the precise terms of the contract they have secured. *Vastine v. Bank of Dallas*, 808 S.W.2d 463, 464 (Tex. 1991); *New Amsterdam Cas. Co. v. Bettes*, 407 S.W.2d 307, 315 (Tex. Civ. App.—Dallas 1966, writ ref'd n.r.e.).

The third full paragraph of the performance bond provides that it is "null and void" if Seal Craft

> (i) shall faithfully perform the Subcontract in every particular and without fraud, defalcation or delay; and (ii) shall satisfy all claims and demands related to the performance of the Subcontract, and (iii) shall fully indemnify and save harmless Contractor from all cost and damage which Contractor may suffer by reason of Principal's failure to faithfully perform the Subcontract in every particular and (iv) shall fully reimburse and repay the Contractor all costs and expenses which the Contractor may incur in making good any such default, and (v) shall pay all costs, expenses and attorney's fees which Contractor may incur in the defense of any suits arising out of the performance of the Subcontract or in the prosecution or defense of any suits arising out of the breach or default of Principal or Surety under the Subcontract or under this bond.

The evidence demonstrates that Seal Craft manufactured and installed 1,430 windows for 585 openings at Montgomery Plaza between January and November 2005; that Seal Craft performed five months' of warranty work in 2006; that both Byrne and Seal Craft demobilized from the job site in August 2006; that Byrne debited the costs that it claimed to have incurred during the warranty period—$93,052—from Seal Craft's retainage; that Byrne's warranty to Kimco expired in February 2007; and that Byrne did not incur any costs or fees during this time relating to any suits involving Seal Craft's work under the subcontract or Gray's performance bond obligation. This evidence and the evidence detailed above that Seal Craft had fulfilled and completed its obligations under the

20

November 17, 2004 subcontract before Byrne demanded that Seal Craft perform CDC's first option show that Gray's obligation under the performance bond was null and void by February 2007, and certainly by the time that Byrne made demand in July 2008 that Gray perform CDC's first option. Indeed, when Gray notified Byrne in August 2008 that it was denying Byrne's claim against the performance bond, Gray stated,

> The bond was given in connection with a subcontract for a project which Byrne undertook for Kimco Montgomery Plaza, L.P. That project has been closed out and complete for two years. Byrne was paid in full. The warranty under the original bonded subcontract has expired. The "warranty" claim which you now make is on a separate project for a different owner, a project on which Seal Craft has no subcontract and Gray has given no bond. It appears to Gray that you are trying to force Seal Craft to subsidize Byrne's current project.

Byrne argues that any conclusion that the bond was null and void before Byrne demanded that Gray perform CDC's first option ignores and renders meaningless the performance bond's "sole discretion" language. Byrne's wrong. Gray's obligations under the performance bond were not perpetual; the bond is expressly null and void when the conditions set forth therein are met. The relevant inquiry therefore is not *whether* Byrne determined, in its sole discretion, that Seal Craft breached the subcontract but *when* Byrne determined, in its sole discretion, that Seal Craft breached the subcontract. Byrne points to its July 22, 2008 letter to Gray and says that there is no dispute that it determined, in its sole discretion, that Seal Craft was in breach of the subcontract. By that time, however, Seal Craft had fulfilled and completed its obligations under the

21

subcontract, and Gray's obligations under the performance bond were null and void. Thus, our analysis does not render the "sole discretion" language meaningless; under the evidence detailed above, the language is simply inapposite.

The evidence viewed in the light most favorable to the verdict supports the jury's finding that Gray did not fail to comply with its performance bond. Accordingly, we hold that the trial court did not err by denying Byrne's motion to disregard jury question number 4 and motion for JNOV that Byrne recover judgment against Gray. We overrule Byrne's first issue.

### D.    Damages

Byrne argues in its third issue that the trial court should have rendered a JNOV in its favor for damages because the evidence conclusively established the amount of Seal Craft's indemnity obligation and Gray's bond obligation. Jury question number 5, the damages question, was conditioned on "Yes" findings to jury question numbers 1 or 4. Having determined that the trial court did not err by denying Byrne's motion to disregard the jury's "No" answers to question numbers 1 and 4 and motion for JNOV that Byrne recover judgment against both Seal Craft and Gray, we hold that the trial court did not err by denying Byrne's motion for JNOV as to damages. We overrule Byrne's third issue.

### E.    Jury Question Number 6—Excessive Pre-suit Demand

In its fifth issue, Byrne argues that the trial court erred by refusing to disregard the jury's "Yes" answer to question number 6, which asked whether

Byrne had made an excessive pre-suit demand on Seal Craft to remove and reinstall the exterior windows at Montgomery Plaza.

Generally, a creditor who makes an excessive claim upon a debtor is not entitled to attorneys' fees for subsequent litigation required to recover the debt. *Findlay v. Cave*, 611 S.W.2d 57, 58 (Tex. 1981). A demand is not excessive simply because it is greater than the amount a jury later determines is actually due. *Pratt v. Trinity Projects, Inc.*, 26 S.W.3d 767, 769 (Tex. App.—Beaumont 2000, pet. denied). The dispositive question is whether the claimant acted unreasonably or in bad faith. *Id.*

Byrne's sole argument is that the jury's finding was immaterial because the excessive-demand doctrine "only applies when a party is seeking to recover attorney's fees under Chapter 38 of the Texas Civil Practice & Remedies Code," and the indemnification clause in article 6.02 of the subcontract provided an express and independent basis upon which Byrne could recover its attorneys' fees from Seal Craft. Like Byrne's damages issue, jury question number 7, which asked about the amount of Byrne's reasonable and necessary attorneys' fees, was conditioned on a "Yes" answer to question numbers 1 or 4. Having overruled Byrne's arguments challenging the jury's "No" answers to question numbers 1 and 4, there is no basis to support an award of attorneys' fees to Byrne, and we need not decide whether the excessive-demand doctrine is limited to an award of attorneys' fees under chapter 38. *See* Tex. R. App. P. 47.1. We overrule Byrne's fifth issue.

23

## IV. FACTUAL SUFFICIENCY

In its fourth issue, Byrne argues that the evidence is factually insufficient to support the jury's "No" answers to question numbers 1 and 4.

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

Byrne submitted evidence that it entered into a subcontract with Seal Craft to install windows at Montgomery Plaza, that it performed its obligations under the subcontract, and that it incurred "losses and expenses" related to Seal Craft's manufacture and installation of the windows and attorneys' fees prosecuting its claims. However, as set out in detail above, there is also evidence that when Byrne demanded in April 2008 that Seal Craft honor its warranty and perform CDC's first option, Seal Craft no longer bore any contractual obligation to Byrne and that Gray's obligation under the performance bond was null and void when Byrne demanded in July 2008 that Gray perform CDC's first option. The jury was the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757,

24

761 (Tex. 2003). Accordingly, considering all of the evidence, we hold that the jury's "No" answers to question numbers 1 and 4 are not contrary to the great weight and preponderance of the evidence.[15] *See Dow Chem. Co.*, 46 S.W.3d at 242 (reasoning that when the party with the burden of proof appeals from a failure to find, the party must show that the failure to find is against the great weight and preponderance of the evidence). We overrule Byrne's fourth issue.

## V. CONCLUSION

Having overruled each of Byrne's issues, we affirm the trial court's judgment.

BILL MEIER
JUSTICE

PANEL: GARDNER, MEIER, and GABRIEL, JJ.

DELIVERED: August 22, 2013

---

[15]*See Gonzalez v. McAllen Med. Ctr., Inc.*, 195 S.W.3d 680, 681 (Tex. 2006) ("[N]either the appellate rules nor this Court require detailed recitations of the evidence when a factual sufficiency complaint is overruled.").